UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

FERTILIZANTES TOCANTINS S.A.,

    Plaintiff,

v.                            Case No. 8:21-cv-2884-VMC-JSS

TGO AGRICULTURE (USA) INC.,

    Defendant.
_____/

**ORDER**

This matter comes before the Court upon consideration of
Plaintiff Fertilizantes Tocantins S.A.'s Motion for Summary
Judgment (Doc. # 69), and Defendant TGO Agriculture (USA)
Inc.'s Motion for Summary Judgment. (Doc. # 70). TGO responded
to FTO's Motion (Doc. # 76), and FTO has replied. (Doc. #
82). FTO has responded to TGO's Motion (Doc. # 75), and TGO
has replied. (Doc. # 81). For the reasons that follow, the
parties' Motions are denied.

I.   **Background**

This case involves an alleged contract to purchase a
common fertilizer ingredient.

A. **The Parties and Prior Dealings**

FTO is a Brazilian corporation that specializes in the
importation, blending, and sale of fertilizer products to

1

farmers in Brazil. (Doc. # 69-2 at 50:12-15, 59:25-62:8). It is a subsidiary of EuroChem Group AG. (<u>Id.</u> at 24:22-25:8). FTO is sometimes referred to as Tocantins or EuroChem by the parties. (<u>Id.</u> at 24:1-25:6, 26:16-26:20, 29:5-19, 30:17-30:22; Doc. # 69-5 at 46:3-5, 95:18-21). Eric Santos and Lucas Janaudis worked as Supply Directors for FTO during the relevant time period. (<u>Id.</u> at 14:21-25; 58:9-16). Mr. Santos and Mr. Janaudis were responsible for purchasing fertilizer products from suppliers. (<u>Id.</u> at 59:10-60:4).

TGO is an American corporation with offices in Tampa, Florida, and Chicago, Illinois, that specializes in trading agricultural chemicals internationally. (Doc. # 70-3 at ¶ 2). TGO is the subsidiary of a Chinese supplier. (Doc. # 69-5 at 26:4-26:10). Mauricio Bodanese was a third-party representative of TGO for approximately one year between 2020 and 2021. (Doc. # 70-3 at ¶ 4). He facilitated fertilizer sales to Brazilian resellers on behalf of TGO. (<u>Id.</u>). He was not an employee of TGO. (<u>Id.</u> at ¶ 5). He worked with Daigy Cadorna, who was also not affiliated with TGO. (Doc. # 69-5 at 153:19-24). While he was a representative of TGO, Mr. Bodanese was also employed by Dreymoor, a company that also resold agricultural chemicals. (<u>Id.</u> at 163:7-13). Mr.

Bodanese ceased being a representative for TGO in May 2021. (Doc. # 70-3 at ¶ 5).

In the course of Mr. Bodanese's role as TGO's broker in Brazil, he communicated primarily with TGO's managing director, William Cui, via the commonly used communication technology known as WhatsApp. (Doc. # 69-5 at 46:23-25). Mr. Bodanese would notify Mr. Cui via WhatsApp of potential transactions he was working on, present offer and bid terms, discuss logistics and counter-proposals, and seek Mr. Cui's approval to confirm TGO's acceptance of all transactions. (Id. at 50:1-20). Mr. Cui had to approve all offers before Mr. Bodanese made or accepted them. (Id. at 186:25-187:2).

TGO sells ammonium sulfate, a common component of fertilizer. (Doc. # 69-5 at 22:25-23:2). The parties dispute whether TGO was able to deliver ammonium sulfate with the 21 percent nitrogen content required by Brazilian law. TGO states that it only has a supply contract to purchase for resale ammonium sulfate with a nitrogen content of 20.5 percent. (Doc. # 70-3 at ¶ 17). FTO asserts that, as a trader, TGO could fulfill a contract to provide ammonium sulfate with 21 percent nitrogen content. (Doc. # 75 at 3). Further, it contends that under Brazilian regulations, ammonium sulfate with a nitrogen content of 20.5 percent is classified and

3

sold as 21 percent nitrogen content. (Doc. # 69-2 at 75:21-25; 231:6-18).

FTO and TGO engaged in two prior deals for fertilizer components before the September 2020 transaction at issue in this case. In July 2017, TGO sold phosphate to FTO. (Doc. # 70-4). The parties memorialized the deal with a written, signed contract. (Id.). The contract included details on the product specifications (e.g., nitrogen content, size, color), quantity, price, and shipping details. (Id. at 2-3). In July 2020, TGO sold ammonium sulfate to FTO. (Doc. # 70-5). The parties also memorialized that agreement with a written, signed contract. (Id.). That contract included terms on the product specifications, quantity, price, and shipping and payment instructions. (Id. at 2-3). Notably, the final contract states that the ammonium sulfate will have 20.5 percent nitrogen content. (Id. at 2).

The parties dispute whether they had a custom of requiring written contracts for sales. Mr. Janaudis stated in his deposition that sales could be completed orally, without any written confirmation. (Doc. # 69-2 at 125:1-6; 134:16-24). He said that he had negotiated about two thousand deals in his seven years in the agricultural chemicals industry. (Id. at 129:17-18; 134:13-15). He stated that contracts are

formed through phone calls, WhatsApp messages, and emails.
(Id. at 130:14-19). He also testified that it was common for
contracts to be formed without written confirmation (Id. at
134:8-18), and that any written agreement operates as a
supplement to the initial contract, adding additional, non-
material terms or specifications. (Id. at 134:19-25; 135:1-
8). Mr. Cui stated that TGO only makes sales pursuant to
signed contracts. (Doc. # 70-3 at ¶ 3; Doc. # 69-5 at 186:2-
4). He further testified that "detailed offers, confirmation
emails and the contract" are required to create a binding
agreement. (Doc. # 69-5 at 195:23-196:2). TGO also submits
the testimony of its expert, Richard Beardmore, who states
that it is customary for parties to large agribusiness
transactions to enter into detailed written agreements. (Doc.
# 70-13 at 2-4).

**B. September 2020 Transactions**

On September 11, 2020, Mr. Santos and Mr. Bodanese
discussed terms of a deal for TGO to provide FTO with 20,000
metric tons (MT) of ammonium sulfate at a price of 145 USD
per MT. (Doc. # 69-2 at 148:14-151:14; 161:3-162:11; Doc. #
69-12). Mr. Janaudis testified during his deposition that Mr.
Santos and Mr. Bodanese discussed terms on a phone call or
over text message. (Doc. # 69-2 at 148:11-23). Mr. Janaudis's

testimony is inconsistent regarding how he learned of their
discussion. He stated in his deposition that he heard the
discussion because he was sitting in front of Mr. Santos while
it happened. (Id. at 144:16-24). He further recalled that he
observed Mr. Santos speaking with Mr. Bodanese because he and
Mr. Santos sat facing each other. (Doc. # 70-8 at 34:9-18).
However, he also testified that he was in another meeting
while Mr. Santos and Mr. Bodanese negotiated and that he
learned of the details of the discussion from a later
conversation with Mr. Santos. (Id. at 35:4-8; Doc. # 69-2 at
165:16-22).

On September 11, 2020, Mr. Bodanese sent several
WhatsApp messages to Mr. Cui. Mr. Bodanese wrote, "I have a
firm bid from Tocantins 20k Amsul shipment
august/September/October our option. 20k to Vila do conde
port. 145,000 CFR." (Doc. # 69-12 at 2). Approximately twenty
minutes later, Mr. Bodanese sent Mr. Cui the following
message: "Closed 20k aug-oct/2021 our option 145,000 CFR Vila
do conde port." (Id. at 6). Mr. Cui responded, "Thanks." (Id.
at 8).

The parties dispute the repercussions of the discussion
between Mr. Santos and Mr. Bodanese. Mr. Janaudis testified
that Mr. Santos told him he had agreed to a deal to purchase

20,000 MT of ammonium sulfate from TGO. See (Doc. # 69-2 at 146:10-16) ("So he say, Hey, I close at 20,000 tons at 145 CFR to Hidrovias to be shipped in August-October next year."). Mr. Cui, on the other hand, states that Mr. Santos and Mr. Bodanese "discovered some mutual interest in making a transaction[,] [b]ut TGOA never gave its consent or agreement to a potential transaction with Tocantins." (Doc. # 70-3 at ¶ 23-24).

About two hours after Mr. Cui's last message to Mr. Bodanese on September 11, 2020, FTO procurement coordinator, Jordanna Magre de Brito Gebrim, sent TGO an email with the subject line, "Purchase Confirmation." (Doc. # 69-5 at 257). She wrote, "Thanks for the new business! Please find below the purchase confirmation." (Id.). The email described terms of a sale of 20,000 MT of ammonium sulfate at a price of 145 USD per MT. (Id.). Both Mr. Cui and Mr. Bodanese were recipients. (Id.). TGO did not respond to the email. (Id. at 77:6-8; 80:2-7; Doc. # 69-2 at 168:20-169:1).

Approximately two hours after FTO sent the email, Mr. Bodanese wrote to Mr. Cui in a series of WhatsApp messages, "[C]an we increase +10k to Eurochen [sic]? Instead of 20 they wanna 30[.] Can I go ahead?" (Doc. # 69-8 at 3-5). Mr. Cui responded, "Ok." (Id. at 6). Mr. Bodanese wrote back, "Closed

+ 10k." (Id. at 13). Mr. Janaudis testified that he and Mr. Bodanese agreed to modify the deal by increasing the quantity of ammonium sulfate by 10,000 MT, for a total of 30,000 MT. (Doc. # 69-2 at 177:10-13).

On September 30, 2020, FTO made a second request to modify the deal by increasing the quantity by an additional 15,000 MT of ammonium sulfate at the same price of 145 USD, bringing the total to 45,000 MT. (Id. at 180:11-182:17). That day, Mr. Bodanese sent the following WhatsApp messages to Mr. Cui:

- [2:52:03 PM] firm bid from Tocantins for additional 15k in the same vessel to VDC vila fo conde [sic]. Ago-Oct next year
- [2:52:08 PM] 145 CFR
- [2:52:34 PM] Also bid for 1.3k to fertiman (unsold tiger hebey 141 cfr)

(Doc. # 69-5 at 268-70). Mr. Cui responded, "We can agree 141 on this 1300 mt, but we need 150 on the 15k to VDC." (Id. at 271). Mr. Bodanese clarified in his next message that "It's 2 different deals. I suggest we counter 147,50 in order to don't lose Tocantins deal. 150 most probably we will lose. But up to you." (Id. at 272). Mr. Cui responded, "Ok 147.5." (Id. at 274). Approximately thirty minutes after Mr. Cui's response, Mr. Bodanese wrote:

- [3:40:25 PM] Tocantins is upset with me. Because I gave backing all past week at 145 and this Monday. They said that they have sold it using this number. They are claiming for we keep 145 for this deal. I was not firm with them, but they are a very important client and they are opening their doors for us and giving me last look aways.
- [3:41:26 PM] If you can reconsider and keep 145 it will be very good for our relationship with them. Also they already have 30k 145 in the same vessel.
- [3:42:02 PM] The buyer Eric is very sentimental, for him it is like a cheater from my side.

(Id. at 275-77). Mr. Bodanese again messaged Mr. Cui, "1.3k with fertiman we lose the deal :/" at 4:33 PM. (Id. at 278). At 4:43 PM, Mr. Cui responded, "Ok, go ahead." (Id. at 279). Mr. Cui contends that his message meant "go ahead and do other business," not that he consented to a second modification of FTO's order. (Id. at 127:20-25, 128:1-2). Finally, Mr. Bodanese wrote, "Done o" at 4:47 PM. (Id. at 280).

## C. **Interactions after September 2020**

After September 2020, TGO referenced in several internal communications a deal with FTO for 45,000 MT of ammonium sulfate at a price of 145 USD. On October 16, 2020, Mr. Cui asked Mr. Bodanese to "recap our sales for 2021." (Doc. # 69-10 at 3). Mr. Bodanese responded, in part, "45k to Tocantins VDC/Hidrovias. Aug if I'm not wrong." (Id. at 4). On November 18, 2020, Mr. Cui asked Mr. Bodanese to "recap again our sales for next year." (Doc. # 69-11 at 3). Mr. Bodanese responded,

in part, "45k GAmsul to VDC/Itaqui Tocantins (sep or oct shipment if im not wrong)." (Id. at 6). When Mr. Cui inquired about the price of the FTO deal (Id. at 9), Mr. Bodanese wrote, "145 cfr." (Id. at 10). Mr. Cui responded, "Thanks." (Id. at 11).

On April 29, 2021, FTO sent TGO an email with shipping instructions for 45,000 MT of ammonium sulfate at a price of 145 USD. (Doc. # 69-5 at 284). Mr. Cui, Mr. Bodanese, and Ms. Cadorna were all copied on the email. (Id.). FTO followed up the next day to confirm receipt and asked if there was "already [a] contract for this deal." (Id. at 285). Ms. Cadorna replied, "Confirm the receipt of shipment instructions. We'll return with the contract once available." (Id.). FTO followed up several times, but never received a response from TGO. (Id. at 289-91).

On May 10, 2021, Mr. Janaudis emailed Mr. Cui, writing that "we have been requesting to your team to send the sales contract regarding this business between EuroChem and TGO and no reply from your side." (Id. at 289). He then listed the following terms:

- Ammonium Sulphate
- 45,000t (+/- 10% Seller's Option
- August/October shipment
- USD 145,00 CFR

- Vila do Conde – Hidrovias
- CAD – 5 business days after receiving copy of originals

(Id.). He told Mr. Cui that FTO "need[ed] to have sales contract as soon as possible" because FTO had "done business through a back to back so product is already sold on the field." (Id.).

On the same day, Mr. Cui sent the following WhatsApp message to Mr. Bodanese: "On Ammonium Sulphate, we need your suggestion how to explain and solve the problem that you sold for Dreymore [sic]. Better you make the explanation to Tocantins." (Id. at 292). Mr. Bodanese, who had at this point resigned as a TGO representative, replied, "I'll just give them all docs I have and you can solve the problem as you wish. As I told you our verbal agreement + contract is clear. If you wanna default them it's up to you. Dreymoor has no relation with this situation." (Id.). Mr. Cui then asked twice for Mr. Bodanese to send him a confirmation email regarding the FTO deal. (Id. at 300, 303). However, Mr. Bodanese never responded to this request. On May 14, 2021, Mr. Cui messaged Mr. Bodanese, "We only honor what we confirmed. Internal message exchanges is private and only belong to TGOA!" (Id. at 304).

On May 18, 2021, Mr. Cui responded to FTO's requests for confirmation of the deal by asking Mr. Janaudis for a "sales confirmation email to verify the deal." (Id. at 305). He wrote, "We usually confirmed back if we made a sale." (Id.). Mr. Janaudis replied, "Business confirmation is clearly confirmed/recognized by TGO . . . Bear in that we have done the same procedure last year – on M/V EFI Theo – and we did not have any related issue." (Id.).

TGO refused to deliver the ammonium sulfate, and FTO filed suit on December 13, 2021. (Doc. # 1).

### D. **The Instant Complaint**

In its complaint, FTO alleges breach of express contract (Count I) and breach of implied contract (Count III) based on TGO's failure to deliver 45,000 MT of ammonium sulfate at a price of 145 USD. (Doc. # 1 at 8-10). FTO also seeks the following declaration: FTO and TGO formed a valid and enforceable contract and TGO materially breached the contract by its failure to perform according to its terms (Count II). (Id.).

The parties now both seek entry of summary judgment in their favor. (Doc. ## 69, 70). FTO seeks partial summary judgment on Count I. (Doc. # 69 at 1). TGO seeks summary judgment on all counts. (Doc. # 70 at 1). Each party has

responded (Doc. ## 75, 76), and replied. (Doc. ## 81, 82). The Motions are ripe for review.

## II.  **Legal Standard**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute alone is not enough to defeat a properly pled motion for summary judgment; only the existence of a genuine issue of material fact will preclude a grant of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986).

An issue is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996) (citing Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 918 (11th Cir. 1993)). A fact is material if it may affect the outcome of the suit under the governing law. Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997). The moving party bears the initial burden of showing the court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. Hickson Corp. v. N. Crossarm Co., 357 F.3d 1256, 1260 (11th Cir. 2004) (citing Celotex Corp. v. Catrett, 477 U.S.

13

317, 323 (1986)). "When a moving party has discharged its burden, the non-moving party must then 'go beyond the pleadings,' and by its own affidavits, or by 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593–94 (11th Cir. 1995) (quoting Celotex, 477 U.S. at 324).

If there is a conflict between the parties' allegations or evidence, the non-moving party's evidence is presumed to be true and all reasonable inferences must be drawn in the non-moving party's favor. Shotz v. City of Plantation, 344 F.3d 1161, 1164 (11th Cir. 2003). If a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, the court should not grant summary judgment. Samples ex rel. Samples v. City of Atlanta, 846 F.2d 1328, 1330 (11th Cir. 1988). But, if the non-movant's response consists of nothing "more than a repetition of his conclusional allegations," summary judgment is not only proper, but required. Morris v. Ross, 663 F.2d 1032, 1034 (11th Cir. 1981).

Finally, the filing of cross-motions for summary judgment does not give rise to any presumption that no genuine

14

issues of material fact exist. Rather, "[c]ross-motions must be considered separately, as each movant bears the burden of establishing that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law." Shaw Constructors v. ICF Kaiser Eng'rs, Inc., 395 F.3d 533, 538-39 (5th Cir. 2004); see also United States v. Oakley, 744 F.2d 1553, 1555 (11th Cir. 1984) ("Cross-motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed[.]" (citation omitted)).

## III. **Analysis**

As an initial matter, the Court must determine the body of law to apply to FTO's contract claims. In its motion to dismiss, TGO argued that Illinois law applied because the parties chose to use Illinois law in their past two dealings. (Doc. # 27 at 8). Now, however, it argues that the parties' latest transaction is governed by the United Nations Convention on Contracts for the International Sale of Goods ("CISG"). (Doc. # 70 at 8-9). FTO decries TGO's new argument, stating that "[w]hen the rules of the game no longer favor TGO, TGO simply changes its position." (Doc. # 75 at 2). FTO, however, does not advance any substantive arguments for why

15

the CISG does not apply. During the motion to dismiss phase, the Court determined it was unnecessary to formally decide which law to apply to decide the motion. (Doc. # 43 at 15-16).

The CISG "applies to contracts of sale of goods between parties whose places of business are in different States when the States are Contracting States." CISG, Art. 1(a), opened for signature April 11, 1980, S. Treaty Doc. No. 9, 98th Cong., 1st Sess. 22 (1983), 19 I.L.M. 671, reprinted at 15 U.S.C. app 332 (1998). It governs "the formation of the contract of sale and the rights and obligations of the seller and the buyer arising from such a contract." CISG, art. 4. The CISG automatically applies to international sales contracts between parties from different contracting states unless the parties agree to exclude its application. CISG, art. 6.

"As federal law, the CISG preempts inconsistent provisions of state law such as the Uniform Commercial Code ('UCC')." Asia Telco Techs. v. Brightstar Int'l Corp., No. 15-20608-CIV, 2015 WL 10853904, at *3 (S.D. Fla. Aug. 21, 2015); see also U.S. Const. art. VI, Cl. 2 ("all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land").

16

The parties' places of business are the United States and Brazil, both of which are contracting states to the CISG. See United Nations Comm'n on Int'l Trade Law, Status: United Nations Convention on Contracts for the International Sales of Goods (Vienna, 1980), https://uncitral.un.org/en/texts/salegoods/conventions/sale_of_goods/cisg/status (listing the parties to the CISG, including Brazil and the United States). There is no evidence that the parties intended to exclude the application of the CISG; therefore, the CISG provides the substantive law governing this contractual dispute. See Zhejiang Shaoxing Yongli Printing & Dyeing Co. v. Microflock Textile Grp. Corp., No. 06-22608-CV, 2008 WL 2098062, at *2 (S.D. Fla. May 19, 2008) (noting that when a contract exists between parties from two contracting states, and the parties have not expressly excluded the CISG, "[d]omestic law, including the Uniform Commercial Code as incorporated [by Florida] does not govern the parties' contractual relationship").

## A. **TGO's Motion for Summary Judgment**

TGO contends that, under the CISG, the parties did not form a contract. It contends that (1) FTO provided no admissible evidence demonstrating that the parties formed a contract, (2) TGO had a policy of only making deals pursuant

to signed contracts, (3) that policy was consistent with industry custom, and (4) the parties did not agree on all material terms. (Doc. # 70 at 10-17). In its response, FTO disputes each of these arguments.

## 1. Admissibility of FTO's Evidence of Contract Formation

First, TGO argues that FTO has not advanced admissible evidence that the Court can consider at the summary judgment stage showing that the parties formed a contract. (Doc. # 70 at 10-12). TGO argues that Mr. Janaudis's testimony regarding the first negotiation between Mr. Santos and Mr. Bodanese is the only evidence it has of the parties' initial agreement to sell 20,000 MT of ammonium sulfate. (Id. at 10). It argues his testimony is inadmissible hearsay because Mr. Janaudis did not participate and did not personally observe the negotiation. (Id. at 11-12). FTO contends that Mr. Janaudis personally observed the negotiation. (Doc. # 75 at 11).

"The general rule is that inadmissible hearsay cannot be considered on a motion for summary judgment." Jones v. UPS Ground Freight, 683 F.3d 1283, 1293 (11th Cir. 2012) (quoting Macuba v. Deboer, 193 F.3d 1316, 1322 (11th Cir. 1999)). "When making preliminary factual inquiries about the admissibility of evidence under a hearsay exception, the district court

must base its findings on the preponderance of the evidence. That evidence, however, may include hearsay and other evidence normally inadmissible at trial." <u>LeBlanc v. Nortel Networks Corp.</u>, No. 3:03-CV-65 (CAR), 2006 WL 8445961, at *7 (M.D. Ga. June 30, 2006) (quotation omitted).

"A district court may consider a hearsay statement in evaluating a motion for summary judgment if the statement can be reduced to admissible form at trial[.]" <u>Edwards v. Nat'l Vision, Inc.</u>, 946 F. Supp. 2d 1153, 1161 (N.D. Ala. 2013), <u>aff'd</u>, 568 F. App'x 854 (11th Cir. 2014). "The most obvious way that hearsay testimony can be reduced to admissible form is to have the hearsay declarant testify directly to the matter at trial." <u>Jones</u>, 683 F.3d at 1294 (quoting <u>Pritchard v. S. Co. Servs.</u>, 92 F.3d 1130, 1135 (11th Cir. 1996)). Courts cannot consider hearsay evidence during summary judgment "when there is only a hypothetical witness who might come forward to testify at trial." <u>Lewis v. Residential Mortg. Sols.</u>, 800 F. App'x 830, 834 (11th Cir. 2020).

Here, FTO correctly argues that the statements of Mr. Santos and Mr. Bodanese made during their negotiation are themselves admissible. Language of commercial offer and acceptance is admissible because the statements have independent legal significance. Fed. R. Evid. 801, Adv. Comm.

Notes to Sub. C; see e.g., U.S. v. Mena, 863 F.2d 1522, 531 (11th Cir. 1996) (indicating that utterances involved in making a contract are verbal acts and not hearsay). The issue is whether Mr. Janaudis directly observed Mr. Santos or Mr. Bodanese making those statements.

During his deposition, Mr. Janaudis testified both that he heard the negotiation between Mr. Santos and Mr. Bodanese because he was sitting in front of Mr. Santos while it happened (Doc. # 69-2 at 144:16-24), and that he learned of the details of the discussion from a later conversation with Mr. Santos. (Id. at 165:16-22). Even assuming that Mr. Janaudis's testimony would be hearsay, however, the Court is not aware of any reason why the hearsay declarants, Mr. Santos and Mr. Bodanese, would be unavailable to testify at trial. Both potential witnesses are known and were once under the control of the parties. Contra Jones, 683 F.3d at 1294 ("The possibility that unknown witnesses will emerge to provide testimony on this point is insufficient to establish that the hearsay statement could be reduced to admissible evidence at trial."). Therefore, the Court will consider Mr. Janaudis's testimony for purposes of summary judgment.

Even if the Court did not consider Mr. Janaudis's testimony regarding the initial negotiation between Mr.

Santos and Mr. Bodanese, FTO has advanced other admissible evidence supporting its argument that the parties formed a contract on September 11, 2020, for 20,000 MT of ammonium sulfate. The purchase confirmation email sent by FTO on the same day and the contemporaneous messages between Mr. Bodanese and Mr. Cui are evidence of contract formation.

### 2. **Contract Formation under the CISG**

The rest of TGO's arguments go to whether or not the parties formed a contract under the CISG. TGO argues that any oral agreement would not form a contract because the parties had a custom, consistent with industry-wide practice, of requiring formal written agreements. (Doc. # 70 at 12-13). Moreover, TGO contends that, even if an oral agreement were enough to form a contract, the parties did not agree on certain terms, including nitrogen content, governing law, arbitration, and force majeure, that the parties considered material in prior transactions. (Id. at 13-16).

Under the CISG, "[a] contract of sale need not be concluded in or evidenced by writing and is not subject to any other requirement as to form. It may be proved by any means, including witnesses." Asia Telco, 2015 WL 10853904, at *3 (S.D. Fla. Aug. 21, 2015) (quoting CISG, art. 11). However, "[t]he parties are bound by any usage to which they have

agreed and any practices which they have established between themselves." CISG, art. 9(1). The following provision of the CISG also contemplates industry customs:

> The parties are considered, unless otherwise agreed, to have impliedly made applicable to their contract or its formation a usage of which the parties knew or ought to have known and which in international trade is widely known to, and regularly observed by, parties to contracts of the type involved in the particular trade concerned.

CISG, art. 9(2).

Under the CISG, a "contract is concluded at the moment when an acceptance of an offer becomes effective." CISG, art. 23. A proposal is an offer if it is "sufficiently definite and indicates the intention of the offeror to be bound in case of acceptance." CISG art. 14(1). Article 14(1) further states that "[a] proposal is sufficiently definite if it indicates the goods and expressly or implicitly fixes or makes provisions for determining the quantity and the price." Supercase Enter. Co. v. Marware, Inc., No. 14-61158-CIV, 2014 WL 12495261, at *4 (S.D. Fla. Nov. 24, 2014) (quoting CISG, art. 14(1)). After an offer, a statement made by or other conduct of the offeree indicating assent to the offer is an acceptance. CISG, art. 18(1).

When "determining the intent of a party or the understanding a reasonable person would have had," courts

should give "due consideration . . . to all relevant
circumstances of the case including negotiations, any
practices which the parties have established between
themselves, usages and any subsequent conduct of the
parties." CISG, art. 8(3).

There are several genuine disputes of material fact as
to whether the parties formed a contract under the CISG.
First, there is a genuine dispute of fact regarding the
parties' and the industry's custom of requiring signed,
written contracts. Mr. Janaudis, who has negotiated about two
thousand deals in his seven years in the agricultural
chemicals industry (Id. at 129:17-18; 134:13-15), stated that
contracts are formed through phone calls, WhatsApp messages,
and emails. (Id. at 130:14-19). TGO, however, has adduced
evidence that the parties had an understanding that a written
agreement was required to form a contract. The CISG indicates
that courts should consider the past practices of parties
when determining the parties' intent. In this case, the
parties had two past dealings, each of which was confirmed
with a detailed, written agreement. (Doc. ## 70-4; 70-5).
Further, Mr. Cui stated that TGO only makes sales pursuant to
signed contracts. (Doc. # 70-3 at ¶ 3; Doc. # 69-5 at 186:2-

4). TGO's expert also stated that the agribusiness industry requires signed contracts. (Doc. # 70-13 at 2-4).

Second, there is a factual dispute over the terms the parties required to form a contract. TGO points to the testimony of Mr. Cui and the signed contracts memorializing the parties' prior two deals to argue that the parties had a custom of requiring additional terms to form a binding agreement. Mr. Cui stated in his deposition that TGO considered payment terms and various product specifications material terms that needed to be agreed upon before the formation of a contract. (Doc. # 69-5 at 195:23-196:2). TGO also points out that the two prior signed contracts between parties included payments terms and product specifications. (Doc. # 70-4 at 2-3; Doc. # 70-5 at 2-3). Finally, TGO argues that the parties could never have agreed to a deal to sell ammonium sulfate with 21 percent nitrogen content because it only sold ammonium sulfate with 20.5 percent nitrogen content. (Doc. # 70-3 at ¶ 17). A reasonable jury could determine based on TGO's evidence that the parties required a signed, written agreement with detailed terms to form a contract, and, therefore, that the parties' September 2020 negotiations did not result in a contract.

24

On the other hand, FTO has provided evidence showing that the parties formed a contract under the CISG's traditional offer and acceptance rules and that the parties did not require a signed contract. Mr. Janaudis's testimony regarding the September 2020 negotiations, the WhatsApp messages between Mr. Bodanese and Mr. Cui, and the email from Ms. Gebrim support that FTO made an offer when Mr. Santos offered to buy 20,000 MT of ammonium sulfate at a price of 145 USD per MT. That offer indicated the good (ammonium sulfate) and fixed the quantity (20,000 MT) and the price (145 USD per MT). See Supercase, 2014 WL 12495261, at *4 (S.D. Fla. Nov. 24, 2014) ("Article 14(1) further states that a proposal is sufficiently definite if it indicates the goods and expressly or implicitly fixes or makes provisions for determining the quantity and the price."); see also Chateau des Charmes Wines Ltd. v. Sabate USA Inc., 328 F.3d 528 (9th Cir. 2003) (noting that under the CISG, even oral agreements between the parties are binding as long as the goods, the quantity, and the price are sufficiently detailed).

There is also evidence demonstrating that TGO accepted FTO's offer. Mr. Janaudis testified that Mr. Santos told him Mr. Bodanese accepted the offer during their conversation on September 11, 2020. See (Doc. # 69-2 at 146:10-16) ("So he

25

say, Hey, I close at 20,000 tons at 145 CFR to Hidrovias to be shipped in August-October next year."). Mr. Bodanese also sent Mr. Cui a message on September 11, 2020, alerting Mr. Cui that he had "closed 20k aug-oct/2021 our option 145,000 CFR Vila do conde port." (Doc. # 69-12 at 6). Mr. Cui responded, "Thanks," which a reasonable jury could interpret as evidence that TGO accepted FTO's offer. Mr. Janaudis testified that this was enough to create a binding agreement and that additional, non-material terms, including nitrogen content and payment terms, could be added later. (Doc. # 69-2 at 134:19-25, 135:1-8).

FTO has also produced evidence of subsequent conduct indicating that both parties intended to be bound by the agreement. On September 11, 2020, FTO sent an email to TGO with the details of a sale of 20,000 MT of ammonium sulfate at a price of $145 USD per MT. (Doc. # 69-5 at 257). Mr. Bodanese also referenced the sale several times in communications with Mr. Cui in the months after the parties' negotiations. (Doc. # 69-10 at 3-4; Doc. # 69-11 at 3-11). At no point did Mr. Cui indicate that TGO had not closed the deal with FTO. (Id.). A reasonable jury could find, after considering the relevant circumstances, that FTO and TGO formed a contract based on FTO's evidence.

26

The genuine disputes of fact detailed above go to the heart of FTO's breach of contract claims and prevent the Court from granting summary judgment. Therefore, the Court denies TGO's Motion for Summary Judgment. (Doc. # 70).

**B. FTO's Motion for Summary Judgment**

FTO seeks summary judgment on its breach of express contract claim. (Doc. # 69 at 1). For the reasons stated above, there are material facts in dispute that could lead a reasonable jury to determine that FTO and TGO did not form a contract. Therefore, the Court denies FTO's Motion for Summary Judgment.

Accordingly, it is

**ORDERED**, **ADJUDGED,** and **DECREED:**

(1)  Plaintiff Fertilizantes Tocantins S.A.'s Motion for Summary Judgment (Doc. # 69) is **DENIED.**

(2)  Defendant TGO Agriculture (USA) Inc.'s Motion for Summary Judgment (Doc. # 70) is **DENIED.**

**DONE** and **ORDERED** in Chambers in Tampa, Florida, this 6th day of February, 2023.

VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE

27