UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

FERTILIZANTES TOCANTINS S.A.,

     Plaintiff,

v.                           Case No. 8:21-cv-2884-VMC-JSS

TGO AGRICULTURE (USA) INC.,

     Defendant.

_____/

**ORDER**

     This cause comes before the Court pursuant to the bench trial held on July 18-21, 2023. The parties filed their proposed findings of fact and conclusions of law on November 6, 2023, (Doc. ## 153, 155), along with post-trial briefs. (Doc. ## 152, 154). Plaintiff Fertilizantes Tocantins S.A. ("FTO") filed an objection to Defendant TGO Agriculture (USA) Inc.'s ("TGO") proposed findings of fact and conclusions of law and post-trial brief on November 30, 2023. (Doc. # 156). TGO filed a response to the objection on December 21, 2023. (Doc. # 158). Having considered the evidence and applicable law, the Court grants judgment in favor of Plaintiff FTO and against Defendant TGO.

1

I.    **Background and Procedural History**

On December 13, 2021, FTO initiated this action, alleging that TGO breached a contract for the purchase of fertilizer. (Doc. # 1). FTO sought (1) judgment that TGO had breached an express contract or, in the alternative, an implied contract, and (2) declaratory relief stating that the contract was and remains enforceable, that TGO breached the contract, and that TGO is required to "specifically perform the terms of the Agreement." (Id. at 8-10).

TGO filed a motion to dismiss on January 19, 2022, (Doc. # 27), which the Court denied on April 14, 2022. (Doc. # 43). The parties later filed cross motions for summary judgment on October 17, 2022. (Doc. ## 69, 70). The Court denied these motions on February 6, 2023. (Doc. # 91). That Order also determined that the transaction at issue is governed by the United Nations Convention on Contracts for the International Sale of Goods ("CISG"). (Id. at 17).

Thereafter, this case proceeded to a bench trial to determine several remaining issues: (1) whether the parties and industry have a custom of requiring written, signed contracts; (2) what terms are required for the parties to

2

form a contract; and (3) whether the parties formed a contract.

The Court has carefully considered the evidence and testimony presented at trial, the arguments of counsel, the parties' briefs, the objection and response, and the governing law. The Court now makes the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).

## II. **Findings of Fact**

The Court makes the following findings of fact. To the extent that any findings of fact might constitute conclusions of law, they are adopted as such.

### A. **The Parties**[1]

FTO is a Brazilian fertilizer importer and distributor. (Doc. # 142 at 51:17-24). FTO specializes in the importation, blending, and sale of fertilizer products to farmers in

---

[1] The Court recognizes that several witnesses in this case did not speak English as a first language. Witness Eric Santos used a translator during his testimony, while the other witnesses testified without an interpreter. The Court notes that, based on each witness's demeanor and answers, they appeared to understand the questions posed to them. Additionally, the Court easily understood these witnesses.

Brazil. (Id.); (Doc. # 92 at ¶ 9.a). The company sources component products for fertilizer, such as ammonium sulfate, globally. (Doc. # 142 at 47:12-48:1).

FTO employed Eric Santos as commercial director between 2016 and May 2021. (Doc. # 108 at 13); (Doc. # 144 at 11:17-12:6). FTO also employed Lucas Janaudis as a supply manager until early May 2021. (Doc. # 142 at 165:13-14, 185:1-7). Juan Romero replaced Mr. Janaudis as supply director between May and June 2021. (Doc. # 142 at 185:1-7); (Doc. # 144 at 111:20-22).

TGO is a US-based commodities trader that specializes in trading ammonium sulphate, as well as other agricultural chemicals, internationally. (Doc. # 92 at ¶ 9.b). TGO distributes fertilizer products in Central and South America. (Doc. # 145 at 98:8-12).

William Cui has been employed as TGO's managing director since 2016. (Id. at 98:16-19). Mauricio Bodanese was hired in May or June 2020 to broker fertilizer transactions on behalf of TGO and operated as TGO's agent in the Brazilian market until May 2021. (Id. at 122:3-5, 122:9-10); (Doc. # 143 at 85:22-24); (Doc. # 144 at 18:1-7); (Doc. # 139-16); (Doc. #

139-18 at FTO 002866). Mr. Cui regularly communicated with Mr. Bodanese via WhatsApp with instructions and specifications for transactions. See generally (Doc. # 140-12 to 140-15) (providing messages exchanged between Mr. Cui and Mr. Bodanese).

Additionally, Gavin Liu is a former TGO employee. His responsibilities at TGO mainly included operations, drafting documents, and supervising loading and discharge of products. (Doc. # 145 at 210:21-211:12; 211:22-25).

B.   **Prior Contracts Between the Parties**

FTO purchases ammonium sulfate for import to Brazil. (Doc. # 142 at 47:12-48:1); (Doc. # 144 at 123:21-124:5). FTO and TGO executed and performed three contracts for the sale of ammonium sulfate prior to the contract at issue in this case: one in June 2017, one in July 2017, and one in July-October 2020. (Doc. ## 139-2, 139-4, 139-10). These transactions shed light on the parties' course of dealing.

1.   **June 2017 Contract**

For the June 2017 purchase, Seven Seas, TGO's representative in Brazil at the time, exchanged communications with Gilberto Birkhan, FTO's then-supply

manager. (Doc. # 142 at 65:22-66:25). On behalf of TGO, Seven
Seas sent FTO an email on June 23, 2017, with additional
terms. (Doc. # 139-1). A few days later, TGO sent a proposed
formal contract containing further provisions, and FTO signed
it on June 26, 2017. See (Doc. # 139-2) (contract dated June
26, 2017).

### 2.   July 2017 Contract

For the July 2017 purchase, Mr. Birkhan, FTO's then
supply manager, conducted negotiations with Seven Seas and
formed a contract. (Doc. # 139-3); (Doc. # 142 at 71:20-
72:6). On behalf of TGO, Seven Seas sent FTO an email
outlining additional terms on July 10, 2017. (Doc. # 139-3).
TGO and FTO signed a formal contract, which included
additional terms, on July 11, 2017. (Doc. # 139-4).

### 3.   July-October 2020 Contract

The parties also negotiated a contract between July and
October 2020. On July 16, 2020, FTO sent TGO an email, with
additional terms, thanking TGO for the business. (Doc. # 139-
5). TGO's new representative, Giobo Fertilizantes, responded
on the same day stating that it would start next steps
required to finalize a formal contract. (Id.). TGO sent a

6

proposed contract to FTO on October 6, 2020, which contained further additional terms. (Doc. # 139-6 at FTO 000155); (Doc. # 139-5). Later that month, the parties signed a formal contract. (Doc. # 139-10).

### 4.   Process Followed in Other Purchases

As detailed above, the parties followed a similar process for each of the three prior purchases.

First, the parties negotiated and closed agreements through phone calls, emails, and WhatsApp. (Doc. # 142 at 51:9-16, 62:17-63:7); (Doc. # 144 at 15:13-16, 17:10-15).

Second, the parties memorialized the terms of their initial agreement through an informal "purchase confirmation" or "sales confirmation" sent by one of the parties to the other. (Doc. ## 139-1, 139-3, 139-5). These emails outlined a set of terms that were broader than those discussed and agreed upon during calls and texts. (Doc. ## 139-1, 139-3, 139-5).

Third, TGO issued a proposed written contract, which further expanded the terms. (Doc. ## 139-2, 139-4, 139-10). Whenever TGO drafted a formal, written contract for a deal, it incorporated the terms of the agreement it had already

reached and, at times, negotiated the potential inclusion of additional terms. <u>See</u> (Doc. # 145 at 238:8-20) (noting that contracts were prepared "according to the business confirmation and Mr. Cui's instructions"). Mr. Liu, who was responsible for drafting TGO's contracts, noted that additional terms contained in the formal contracts were often subject to "back and forth" negotiations and were contingent on the approval of all parties. (Doc. # 145 at 239:6-12).

### 5. Written Contracts

As noted above, each of the three prior purchases was memorialized with a detailed, written agreement. (Doc. ## 139-2, 139-4, 139-10). This step is necessary for performance of the contract because "a formal contract . . . is required documentation for customs" in Brazil. (Doc. # 69 at 21).

The parties provided differing interpretations of the significance of these formal contracts. TGO's Mr. Cui stated under oath that "TGO only makes sales pursuant to signed contracts." (Doc. # 91 at 5). In contrast, FTO's Mr. Janaudis testified that the formal contracts only memorialize the terms of existing agreements. (Doc. # 143 at 40:22-25).

The June 2017, July 2017, and October 2020 written agreements included similar provisions. Each formal contract "included details on the product specifications (e.g., nitrogen content, [granularity,] color), quantity, price, and shipping details." (Doc. # 91 at 4); (Doc. # 139-2); (Doc. # 139-4); (Doc. # 139-10). Additionally, the contracts included, among other things, provisions regarding applicable law, arbitration, force majeure, products origin, insurance, inspection, and "Lay-Can," which identifies the date when TGO was required to load the ammonium sulfate in the vessel from China to Brazil. (Doc. # 139-2 at §§ 5, 7-8, 14, 17, 20-22); (Doc. # 139-4 at §§ 5, 7-8, 14, 17, 20-22); (Doc. # 139-10 at §§ 6, 8, 9, 14, 17, 20-22). Each contract was signed by Mr. Cui and a "Director" from FTO. (Doc. # 139-2 at 6); (Doc. # 139-4 at 6); (Doc. # 139-10 at 7).

### 6. Timing of Written Contracts

Both the June 2017 and July 2017 contracts required shipment of the product before the date when these contracts were signed. (Doc. # 139-2 at § 8); (Doc. # 139-4 at § 8). However, the shipment from China to Brazil takes up to two months. (Doc. # 142 at 102:4-7). Thus, although the product

had shipped before the parties signed the June and July 2017 contracts, it arrived in Brazil after FTO had signed and executed the contracts. (Id.); (Doc. # 139-2 at § 8); (Doc. # 139-4 at § 8).

### 7.  Agent Authority

Mr. Santos and Mr. Janaudis had authority to bind FTO to contracts. (Doc. # 142 at 62:21-63:7); (Doc. # 144 at 11:20-12:1, 16:18-17:4). However, they did not have authority to sign the formal, written contracts memorializing each purchase. At trial, Mr. Janaudis testified that he was "not the legal representative of the company," and was not allowed "to sign contracts" because "according to Brazilian laws, you must have the legal representative" sign contracts. (Doc. # 142 at 210:2-14). At trial, Mr. Santos also testified that under FTO's company policy, "contracts [] had to be signed by two directors." (Doc. # 144 at 70:23-71:16). As such, each prior written contract between FTO and TGO was signed by a "Commercial Director" or "Financial Director" from FTO. (Doc. # 139-2 at 6); (Doc. # 139-4 at 6); (Doc. # 139-10 at 7).

As for TGO, Mauricio Bodanese had authority to bind TGO to contracts. (Doc. # 143 at 85:22-24); (Doc. # 139-16 at ¶

3.2); (Doc. # 144 at 18:11-22). Per TGO's procedures, "Mr. Cui had to approve all offers before Mr. Bodanese made or accepted them." (Doc. # 91 at 3).

### 8.  Nitrogen Content

FTO only purchases ammonium sulfate that meets the specifications set forth by the Brazilian Ministry of Agriculture. (Doc. # 142 at 43:1-24, 82:14-83:13, 97:16-98:1, 99:9-12, 194:22-195:2); (Doc. # 143 at 14:2-5, 22:5-23); (Doc. # 144 at 88:11-14). In other words, FTO will accept ammonium sulfate so long as its nitrogen content is between 20.5% and 21%. (Doc. # 144 at 88:11-14).

Indeed, Mr. Bodanese, acting as broker for TGO and with knowledge of industry practices in Brazil, advised Mr. Cui that written contracts for the purchase of ammonium sulfate with Brazilian companies typically reflect 20.5% nitrogen, while the inspector's certificates reflect 21% nitrogen. (Doc. # 145 at 249:17-250:24, 255:23-256:11); (Doc. # 140-11). Mr. Cui himself understood that FTO would accept ammonium sulfate with 20.5% nitrogen. (Doc. # 140-11); see (Doc. # 139-10) (contracting for purchase of ammonium sulfate with 20.5% nitrogen).

11

Consistent with this practice, TGO had entered into at least one prior agreement with FTO for the purchase of ammonium sulfate where the purchase confirmation, bills of lading, and invoices specified 21% nitrogen and the written contract between the parties specified 20.5% nitrogen. (Doc. # 143 at 128:13-24); (Doc. # 144 at 85:15-19); (Doc. # 145 at 259:10-17). Compare (Doc. # 140-2) (specifying 21%), and (Doc. # 139-5) (same), and (Doc. # 139-8) (same), with (Doc. # 139-10) (specifying 20.5%). TGO was bound by and did perform this agreement. (Doc. # 145 at 259:10-17). The product TGO delivered, which FTO accepted, tested at 20.8% nitrogen upon delivery, within the required range mandated by the Brazilian Ministry of Agriculture. (Doc. # 143 at 113:16-20).

Additionally, because of this purchase, FTO was aware that TGO could only guarantee ammonium sulfate with 20.5% nitrogen content. After TGO's representative sent the July 16, 2020, email reflecting a 21% nitrogen content, and after TGO provided FTO a formal written agreement reflecting a 20.5% nitrogen content, FTO asked TGO to modify the nitrogen content in the contract back to "21%" from "20.5% Min." (Doc. # 139-7 at FTO 000092). TGO refused to make this change, explaining

that "the percentage of 20,5% is the minimum value that [the] produce[r] [could] guarantee." (Doc. # 139-6 at FTO 000154). FTO accepted a final contract for ammonium sulfate with 20.5% nitrogen content. (Doc. # 145 at 123:2-9); (Doc. # 139-10 at 2).

###    C.    Industry Standards

####    1.    Spot Purchases

Companies operating within the fertilizer commodities trading market engage in two types of purchases: multi-year purchases and spot purchases. (Doc. # 143 at 227:15-228:2). In multi-year purchases, parties agree to purchase a specified amount of fertilizer product over a defined time period and at a price set using a general formula, such as market price. (Id. at 227:15-228:1). In contrast, spot purchases are "one-off" contracts for smaller amounts of fertilizer products entered into so that traders can fine-tune their overall volume to meet their needs. (Id. at 228:3-16).

Before traders engage in their first purchase with a new counterpart, either a multi-year contract or a spot purchase, they will comprehensively vet their counterpart. (Id. at 229:24-230:11). Absent significant changes to that

counterpart, traders then rely on this initial vetting when engaging in future trades with that counterpart. (Id. at 230:13-231:4).

After this initial vetting, binding contracts, particularly spot purchases, may be finalized by phone, email, or texting. (Id. at 231:21-233:6). The fertilizer commodities trading market in Brazil is fast paced. (Doc. # 142 at 39:10-22, 51:9-13, 62:17-23, 185:24-186:8). As TGO's expert, Richard Beardmore, acknowledged, trading prices fluctuate daily and even hourly. (Doc. # 145 at 171:9-18). As a result, parties cannot wait weeks, or even days, for a formal contract to bind an agreement. (Doc. # 144 at 69:6-11, 92:8-10).

Both TGO and FTO agree that, in their course of dealing and experience in the fertilizer commodities industry, product, price, and quantity are material terms in a sale or purchase of ammonium sulfate. (Doc. # 142 at 39:24-40:2); (Doc. # 143 at 136:3-18); (Doc. # 144 at 13:7-9); (Doc. # 145 at 136:6-8). Other terms beyond product, quantity, and price, are not necessary for an agreement to be binding. (Doc. # 142 at 40:13-41:17); (Doc. # 144 at 14:18-15:12); (Doc. # 145 at 205:8-23). Instead, in commodities trades, parties to spot

14

purchases have an understanding based on prior dealings with each other or standard gap-filling provisions. (Doc. # 142 at 40:13-22, 193:5-7); (Doc. # 144 at 16:6-14, 89:6-9); <u>see</u> (Doc. # 143 at 249:16-22) (FTO's expert, Mr. Reiners, stating that parties engage in a comprehensive vetting process when first deciding to contract with one another and then rely on this information when conducting spot purchases).

While Mr. Beardmore, TGO's expert, stated that it is very risky to finalize a contract without additional terms, he noted that additional terms are not necessary for a contract to be binding. (Doc. # 145 at 205:14-23). Additionally, FTO's expert, Craig Reiners, stated that the necessary terms to be included in a binding contract are quantity, price, and the product. (Doc. # 143 at 234:12-22). Other terms are implicitly agreed upon based on prior interactions. (<u>Id.</u> at 233:23-234:7). Given Mr. Reiners's greater experience with spot purchases and the Court's ability to observe his testimony during trial, the Court finds Mr. Reiners's description of industry standards in spot purchases credible and persuasive.

Finally, the parties agree that a transaction becomes

15

binding once a "bid" is accepted — i.e., when the deal "closes." (Doc. # 142 at 61:17-25); (Doc. # 143 at 31:13-18); (Doc. # 145 at 133:20-23) ("The bid means they gave us offer. It's actually an offer, on these conditions, okay. We confirm exactly what they're asking for, it will be a deal.").

### 2. Nitrogen Content

As mentioned before, the Brazilian Ministry of Agriculture sets the product specifications for ammonium sulfate, requiring 20.5-21% nitrogen content. (Doc. # 142 at 83:1-3); (Doc. # 143 at 19:13-22); (Doc. # 144 at 14:2-4, 14:14-17, 147:18-148:1); (Doc. # 145 at 78:14-23). Ammonium sulfate's actual nitrogen percentage on delivery is often different from the percentage noted in the contract. (Doc. # 142 at 98:23-99:8).

Additionally, ammonium sulfate of 20.5% nitrogen content is often referred as "steel grade," and ammonium sulfate of 21% nitrogen content is often referred to as "capro grade." (Doc. # 143 at 8:5-10:5); (Doc. # 145 at 119:22-120:1). Mr. Cui also testified that "in [the] Brazil market, the [21%] capro grade [ammonium sulfate] product is [$]10 to $15 higher than the [20.5%] steel grade." (Doc. # 145 at 116:2-8).

D.   **September 2020 Contract**

1.   **Negotiations, the Contract, and Subsequent Communications**

The parties' dispute centers on a contract negotiated in September 2020. On September 10, 2020, Mr. Bodanese, of TGO, called Mr. Santos, of FTO, to solicit a bid for the sale of ammonium sulfate. (Doc. # 144 at 22:9-23:19). FTO then submitted a "firm bid" to TGO for the purchase of 20,000 metric tons of ammonium sulfate at the price of $145 per metric ton for delivery to the Vila do Conde Hidrovias ("Vila do Conde") port in Brazil in fall 2021. (Doc. # 140-13 at FTOvTGO_004215); (Doc. # 144 at 22:9-23:19). Mr. Santos discussed the terms of FTO's bid with Mr. Bodanese first over the phone and then through WhatsApp messages. (Doc. # 144 at 22:9-15, 23:11-24:6); (Doc. # 140-9 at 5). TGO accepted FTO's bid, with Mr. Bodanese confirming the acceptance and terms of the deal via WhatsApp, and further agreeing to source product from the same producers the parties had agreed to in their prior deal. The WhatsApp messages read:

> [09/11/2020 1:47:52 p.m.] Mauricio Bodanese: It's a done deal 145 [emoji]
>
> [09/11/2020 1:47:54 p.m.] Eric O Santos: and?

17

[09/11/2020 1:47:58 p.m.] Eric O Santos: great

[09/11/2020 1:48:03 p.m.] Eric O Santos: that´s brilliant

[09/11/2020 1:48:10 p.m.] Mauricio Bodanese: Shit, I couldn´t believe it

[09/11/2020 1:48:19 p.m.] Eric O Santos: for waterways, right?

[09/11/2020 1:48:28 p.m.] Mauricio Bodanese: Yes

[09/11/2020 1:48:39 p.m.] Mauricio Bodanese: Vila do Conde sails August to October

[09/11/2020 1:48:48 p.m.] Mauricio Bodanese: 20k

[09/11/2020 1:48:57p.m.] Mauricio Bodanese: And I can give you backing for more volume

[09/11/2020 1:52:11 p.m.] Eric O Santos: What about the producer?

[09/11/2020 1:52:18 p.m.] Eric O Santos: has to be first rate, right?

[09/11/2020 1:57:17 p.m.] Mauricio Bodanese: Yes, yes, use the names of the last ones and any different ones will have to be in agreement with you

(Doc. # 140-9 at 5).

TGO's internal communications further confirm TGO's assent to this deal. Per TGO's procedures, "Mr. Cui had to approve all offers before Mr. Bodanese made or accepted them."

18

(Doc. # 91 at 3). Mr. Bodanese conveyed FTO's bid via WhatsApp message to Mr. Cui. (Doc. # 140-13 at FTOvTGO_004215). Eighteen minutes later, Mr. Bodanese confirmed that he "closed" the purchase, to which Mr. Cui replied approvingly, "thanks." (Doc. # 140-12 to 140-15 at FTOvTGO_004219, FTOvTGO_004221); (Doc. # 143 at 109:3-7).

After closing this initial purchase of 20,000 metric tons of ammonium sulfate, Mr. Bodanese requested FTO send a "purchase confirmation" email to TGO memorializing the key terms of price, quantity, and product, and incorporating the other terms contained in the purchase confirmation from the parties' July 2020 deal. (Doc. # 144 at 25:22-26:10, 58:17-59:7, 91:6-13); (Doc. # 142 at 81:20-82:3); (Doc. # 140-9 at 5). FTO's Mr. Santos testified:

> Q. What were the specific terms?
>
> A. He said that the price was confirmed, that it was closed. And then he asked for the purchase confirmation to be sent, similarly to what had happened with the previous deal.

(Doc. # 144 at 24:3-6). He further testified:

> A. So when I closed the second deal with [Mr. Bodanese], I wanted to ensure that he would keep the same standards that we had agreed upon from the negotiation before. So he asked me to put in an e-

mail and put the names of the same producers that
were in the e-mail before.

Q. And he told you to send that to his superiors at
TGO; right?

A. That's what's written.

(Id. at 91:6-13).

FTO agreed to send a purchase confirmation, and Mr.
Santos and Mr. Janaudis coordinated its transmission through
an email sent on September 11, 2020, by Jordanna Magre de
Brito Bebrim. (Doc. # 144 at 25:19-24, 59:9-10); (Doc. # 142
at 120:2-11); (Doc. # 139-11); (Doc. # 140-9 at 5). Aside
from the variables unique to this particular deal (price,
quantity, shipping location, and date), the purchase
confirmation contained the exact same terms as the parties'
prior deal. (Doc. # 144 at 25:19-24, 58:10-59:12, 101:8-13);
(Doc. # 139-5); (Doc. # 139-11). Mr. Santos was not copied in
the September 11, 2020, email, nor was any "Director" or legal
representative from FTO. (Doc. # 139-11).

However, after FTO emailed the purchase confirmation,
that same day, FTO offered to increase its purchase of
granular ammonium sulfate by 10,000 metric tons. (Doc. # 142
at 27:19-23); (Doc. # 143 at 109:21-110:1, 114:17-21, 115:19-

20

116:7, 118:4-17); (Doc. # 144 at 66:21-23); (Doc. # 139-11);
(Doc. # 140-13 at FTOvTGO_004232-33). The parties agree that
FTO sought to add this quantity under the same price terms as
the initial purchase of 20,000 metric tons. (Doc. # 142 at
125:6-10); (Doc. # 143 at 109:21-110:1, 114:17-21, 115:19-
116:3, 118:4-17).

TGO's agent Mr. Bodanese informed Mr. Cui of FTO's
proposed modification and asked for permission to accept; Mr.
Cui provided his assent. (Doc. # 140-13 at FTOvTGO_004232-
35). TGO confirmed a "close" of the additional 10,000 metric
tons on September 11, 2020. (Doc. # 142 at 125:6-10); (Doc.
# 143 at 109:21-110:1, 114:17-21, 115:19-116:7, 118:4-17);
(Doc. # 140-13 FTOvTGO_004242).

On September 11, 2020, at 4:35 p.m., Mr. Bodanese texted
Mr. Santos: "Boss, ask your people to send me confirmation
for the same emails as the last one. Copy William [Cui] and
Tom [Kendall from TGO]." (Doc. # 140-9 at 5). Four minutes
later, Mr. Santos replied to Mr. Bodanese: "It's being sent
now." (Id.). However, no email confirmation was sent.

On September 23, 2020, FTO requested a second
modification to the parties' agreement to increase the

21

quantity purchased by a further 15,000 metric tons for a total purchase of 45,000 metric tons, all at $145 per metric ton. (Doc. # 142 at 27:24–28:4, 125:3-5, 125:11-18, 126:2-11); (Doc. # 143 at 118:19-23, 159:6-19); (Doc. # 144 at 66:21-24); (Doc. # 140-13 at FTOvTGO_004248). In response to this bid, TGO offered to sell the additional 15,000 metric tons at $147.50 per metric ton. (Doc. # 140-14 at FTOvTGO_004310).

FTO rejected TGO's counteroffer. (Id. at FTOvTGO_004311). FTO was firm in its offer at $145 per metric ton because FTO had already sold product to its own customer based on the cost of $145 per metric ton. (Id.); (Doc. # 143 at 146:20-23). After some urging by Mr. Bodanese, Mr. Cui agreed to the modification, stating "Ok, go ahead." (Doc. # 143 at 155:15-156:4); (Doc. # 140-14 at FTOvTGO_004311-15). Mr. Bodanese then conveyed to FTO via WhatsApp that TGO accepted its offer, modifying the deal to include a total of 45,000 metric tons of granular ammonium sulfate at $145 per metric ton. (Doc. # 142 at 27:24-28:6, 126:2-17). No email confirmation was sent.

TGO's internal communications confirm that TGO knew it reached a binding deal with FTO. On October 16, 2020, Mr. Cui

asked Mr. Bodanese for a "recap" of 2021 sales. (Doc. # 140-14 at FTOvTGO_004335). Mr. Bodanese immediately responded with "45k to [FTO] VDC/Hidrovias. Aug if I'm not wrong." (Id. at FTOvTGO_004336). Mr. Cui did not question Mr. Bodanese, did not object, and made no other indication that he had not assented to that sale or that the parties needed to agree on anything further to have a binding agreement.

Mr. Cui asked for yet another "recap" of 2020 sales on November 18, 2020. (Doc. # 140-14 at FTOvTGO_004360). Mr. Bodanese responded "45k G [ammonium sulfate] to VDC/Itaqui [FTO] (sep or oct shipment if im not wrong)." (Id. at FTOvTGO_004363). Mr. Cui likewise did not question, object to, or express either surprise or disagreement. Instead, he asked Mr. Bodanese to confirm the contract price, then responded with "thanks." (Id. at FTOvTGO_004366-68).

On January 15, 2021, FTO's Ms. de Brito emailed Mr. Janaudis to remind him that no response had been received. (Doc. # 139-11 at FTO 001524).

On April 29, 2021, FTO emailed TGO shipping instructions to aid in the delivery of the 45,000 metric tons of ammonium sulfate. (Doc. # 142 at 143:5-11); (Doc. # 140-4). The next

23

day, FTO asked TGO: "Do we already [have] the Contracts for this deal?" (Doc. # 139-18 at FTO 002871). TGO did not circulate a formal contract to FTO. (Doc. # 142 at 145:11-23).

On May 5, 2021, FTO emailed TGO, asking TGO to "kindly send us the Contract for business in subject," also adding "we still don't have a contract from you." (Doc. # 139-18 at FTO 002870).

On May 10, 2021, FTO emailed TGO again, stating: "Just a kind reminder, we are still waiting the Contract. Appreciate your prompt return." (Id. at FTO 002869). Later that day, FTO again emailed TGO, stating: "We have been requesting to your team the sales contract." FTO also stated: "we need to have sales contract as soon as possible." (Id. at FTO 002868). That same day, Mr. Cui "asked twice for Mr. Bodanese to send him a confirmation email regarding the FTO deal. However, Mr. Bodanese never responded to this request." (Doc. # 91 at 11). Additionally, Mr. Bodanese warned Mr. Cui that the agreement with FTO was "clear," and TGO likely would face FTO "in court" if it repudiated the agreement. (Doc. # 140-14 at FTOvTGO_004450-51); see also (Doc. # 143 at 200:3-201:1). Mr.

24

Bodanese thereafter asserted that TGO had failed to honor its contract with him as a result of non-payment and terminated his relationship with TGO. (Doc. # 143 at 206:6-15, 210:11-18); (Doc. # 140-14 at FTOvTGO_004455).

On May 13, 2021, FTO emailed TGO again, asking TGO to "[k]indly revert with the sales contract." (Doc. # 139-18 at FTO 002867).

On May 14, 2021, TGO's Mr. Cui sent Mr. Bodanese a WhatsApp message indicating he did not intend to deliver the 45,000 tons of ammonium sulfate to FTO. (Doc. # 140-15 at FTOvTGO_004462). He stated: "We only honor what we confirmed." (Id.). The same day, Mr. Cui also emailed FTO indicating that the parties never closed a deal. (Doc. # 139-18 at FTO 002861-65).

On May 18, 2021, FTO emailed TGO again asking TGO "[p]lease to kindly revert with the sales contract in order to start internal procedures." (Id. at FTO 002865). Later that day, FTO again asked TGO to "send [the] sales contract." (Id. at FTO 002862). For a third time that day, FTO again asked TGO to "[p]lease revert with [the] sales contract as soon as possible." (Id. at FTO 002861).

25

In response to these emails, Mr. Cui maintained that there was no deal because TGO had not responded to the September 11, 2020, email with a sales confirmation. (Id. at FTO 002861-63, FTO 002865).

Mr. Bodanese was also copied in the multiple emails in which FTO asked for a formal contract. When asked by FTO, Mr. Bodanese replied that he had held a "negotiation" with FTO and that he did not believe that TGO would "have any problem to move ahead the negotiation." (Id. at FTO 002866).

On June 9, 2021, FTO's in-house attorney sent TGO a Notice of Demand, which claimed that TGO and FTO had reached an agreement for 45,000 metric tons of ammonium sulfate. (Id. at FTO 002859). On June 17, 2021, the attorney sent TGO a Notice of Breach, which again claimed that TGO and FTO had reached an agreement. (Id. at FTO 002858). Later, on June 17, 2021, he sent TGO a second Notice of Breach, which again claimed that TGO and FTO had reached an agreement for ammonium sulfate. (Doc. # 1-2 at 2).

## 2.    Context of the September 2020 Contract

### a. Non-Material Terms

While the parties agreed on the three material terms, they did not explicitly reach an agreement on several non-material terms.

For example, the parties did not explicitly agree upon the nitrogen content of the ammonium sulfate. TGO can only supply 20.5% steel grade ammonium sulfate. (Doc. # 145 at 120:8-24). Mr. Bodanese was aware of this limitation (Id. at 120:21-24, 121:12-122:2); (Doc. # 140-12 at FTOvTGO_003990). Mr. Cui testified that the text messages between him and Mr. Bodanese concerning the September 2020 contract were incomplete, among other things, because they did not specify a nitrogen content. (Doc. # 143 at 102:9-25). He also testified that he objected to the September 11, 2020, email because it showed a nitrogen content of 21%. (Id. at 103:15-24). However, as discussed above, industry standards and the parties' previous course of dealing suggest the parties did agree on this term, despite the written discrepancy.

Additionally, there was a dispute about the quantity divergence term. This term allows "a variation on the size of

27

the vessel and how much product" can be shipped "in the vessel." (Doc. # 142 at 101:10-17). Thus, under a term "plus or minus 11 percent in seller's option," (Id. at 101:10-11), TGO as a seller could load up to 11% less quantity in the vessel from China to Brazil. The purchase confirmation, emails, and shipping instructions from FTO show either a quantity divergence term of "+/- 10% seller's option," (Doc. # 139-11 at FTO 001524); (Doc. # 139-18 at FTO 002865), or a "Total Quantity" of 45,000 metric tons without any "+/-" quantity divergence term. (Doc. # 139-13 at FTO 00298). Similarly, the June 2017 and July 2017 contracts show the same term. (Doc. ## 139-2, 139-4). In contrast, the October 2020 contract reflected a term of "plus or minus 11 percent in seller's option." (Doc. # 142 at 101:6-20); (Doc. # 139-10 at § 3). Therefore, while TGO relies on the October 2020 contract to show a discrepancy, the contracts prior to the September 11, 2020, purchase confirmation contain matching terms.

### b. Testimony Regarding the Existence of a Contract

Mr. Janaudis testified that after FTO sent the September 11, 2020, purchase confirmation, he "expected TGO to draft a contract," which may include "additional terms," and that he personally requested a formal contract. (Doc. # 142 at 145:20-21, 207:7-14). However, he and Mr. Santos agreed that the formal contract would only memorialize the existing contract. (Doc. # 143 at 40:22-25); (Doc. # 144 at 17:1-4).

Similarly, while Mr. Cui initially testified that a contract did not exist, e.g., (Doc. # 143 at 203:11-204:1) (testifying that TGO had rejected the September 11, 2020, email), he later conceded that TGO and FTO had "closed" the deal for 45,000 metric tons of ammonium sulfate. (Doc. # 143 at 109:3-7, 131:23-132:1, 132:15-18, 133:5-14, 140:13-17, 150:21-24, 158:7-9). In his testimony, Mr. Cui also noted issues with TGO's ability to source quality ammonium sulfate during the same period. (Id. at 165:7-170:5).

Both FTO's Mr. Janaudis and Mr. Santos testified that, in their decades of experience in the Brazilian fertilizer market, neither has ever faced a situation where a supplier

denied a binding agreement after confirmation of a trade either by phone or electronic communication. (Doc. # 142 at 62:11-16, 153:16-21); (Doc. # 144 at 17:5-17, 69:1-11). FTO's expert, Mr. Reiners, also testified that he had never encountered a similar situation. (Doc # 143 at 231:21-232:2).

Mr. Janaudis and Mr. Santos also both testified that allowing such a repudiation would wreak havoc on this industry, where fast paced commodity trading is an essential practice. (Doc. # 142 at 62:17-63:1; 185:24-186:15); (Doc. # 144 at 69:1-11). This testimony relates to the fact that TGO knew FTO was relying on TGO's delivery of 45,000 tons of ammonium sulfate at a price of $145 per ton in order to satisfy obligations to its own domestic customers. (Doc. # 140-14 at FTOvTGO_004311).

c. **Quality Complaint Regarding Ammonium Sulfate Sent Under the October 2020 Contract**

In December 2020—three months after FTO sent the purchase confirmation and five months before TGO repudiated the contract—FTO complained to TGO about the quality of the ammonium sulfate that TGO delivered under the October 2020 contract. (Doc. # 92 at ¶ 9.f). On December 22, 2020, after

30

FTO's Mr. Santos took "photographs of the [ammonium sulfate] shipment from TGO" that FTO received for the October 2020 contract, Mr. Santos told TGO's agent Mr. Bodanese "it was a shit show." (Doc. # 144 at 82:3-14). Mr. Janaudis also stated that FTO made a "granularity claim" against the ammonium sulfate TGO delivered under the October 2020 contract. (Doc. # 142 at 218:12-15). In this "granularity claim," FTO complained that the ammonium sulfate TGO delivered under the October 2020 was "out of specification." (Id. at 218:16-19).

The October 2020 contract stated that TGO was required to conduct an inspection "at the loading port determined by an independent international inspection company, whose inspection and certificate" had to be to be "taken as final for both parties." (Doc. # 139-10 at § 17). Intertek conducted the inspection. (Doc. # 145 at 138:21-139:10). The company's report concluded that "everything [was] in line what the contract required." (Id.). On February 23, 2021, Mr. Cui sent the Intertek report to Mr. Bodanese. (Doc. # 145 at 139:11-24); (Doc. # 140-12 to 140-15 at FTOvTGO 004377). FTO did not initiate an arbitration against TGO because of this report, which complied with the terms of the October 2020 contract.

31

### E.   <u>Cover Contracts</u>

Because FTO had re-sold the ammonium sulfate it purchased from TGO to its customers, FTO had a contractual obligation to deliver. (Doc. # 144 at 62:17-63:14); (Doc. # 140-14 at FTOvTGO_004311). As such, FTO had to locate cover product so that it did not default on its obligations to customers.[2]

### 1.   Cover Contracts

FTO executed four cover contracts. First, FTO allocated 3,000 metric tons of ammonium sulfate from a 10,000 metric ton contract with Saftco, executed on May 25, 2021. (Doc. # 140-5); (Doc. # 152 at 29). FTO purchased this ammonium sulfate at $229 per metric ton, for delivery to the Santos port in July 2021. (Doc. # 140-5). Additionally, FTO executed a second contract with Safto to purchase an additional 11,000 metric tons at $280 per metric ton, also delivered to Santos

---

[2] FTO's main witness regarding the cover contracts was Juan Romero. As will be addressed later, FTO did not properly disclose Mr. Romero as a witness during discovery. Therefore, the Court will not discuss or rely on Mr. Romero's testimony in reaching its decision, with the exception of minimal references during its analysis of whether Mr. Romero was properly disclosed.

in July 2021. (Doc. # 140-6). FTO also negotiated a contract with Ameropa for 8,000 metric tons of ammonium sulfate delivered to Santos, at $255 per metric ton. (Doc. # 139-17). Finally, FTO allocated 23,000 metric tons from an agreement to purchase 30,000 metric tons from Yingu Yunnan, at $327 per metric ton, for delivery to the port of Vila do Conde. (Doc. # 140-7); (Doc. # 152 at 30). The companies that FTO contracted with for its cover contracts were all located outside North America and the ammonium sulfate sold was all produced in China. (Doc. # 139-17 at 1); (Doc. # 140-5 at 1-2); (Doc. # 140-6 at 1); (Doc. # 140-7 at 1).

## 2. Reasonableness of Cover Contracts

Various market forces led to FTO spending substantially more than its contracted-for price of $6,525,000 to cover TGO's default. Most importantly, the market price for ammonium sulfate continually increased, at times drastically, between the fourth quarter of 2020 and the fourth quarter of 2021. (Doc. # 142 at 147:13-19); (Doc. # 143 at 240:22-241:14).

FTO also provided testimony from its expert, Mr. Reiners, to demonstrate that FTO's cover costs were

33

reasonable. (Doc. # 143 at 235:9-18, 260:1-18). Mr. Reiners testified that he looked at the "[Bloomberg] North American Green Markets" index to determine whether the prices FTO paid for its cover purchases were reasonable. (Id. at 260:1-18). Based on this source, he determined that the prices were reasonable. (Id. at 240:4-8, 241:5-14). He acknowledged that there is a "Brazil Green Markets" index, but that he didn't use it, and that he used the "North American" because that is "the only one [he has] used." (Id.). He also acknowledged that prices are "different in places outside of North America." (Id.).

### 3. Logistics Costs

Most of the cover contracts specified that the ammonium sulfate would be delivered to a different port than that expected under the TGO contract. The two Saftco contracts and the Ameropa contract provided that the ammonium sulfate would be delivered to Santos port. (Doc. # 140-5); (Doc. # 140-6); (Doc. # 139-17). However, the contract with Yingu Yunnan established that the ammonium sulfate would be delivered to Vilo do Conde port, (Doc. # 140-7), the same port to which

FTO anticipated TGO would deliver ammonium sulfate. (Doc. # 139-11).

### 4.   Disclosure of Mr. Romero as a Witness

At trial, Juan Romero testified regarding "damages." (Doc. # 144 at 108:10-23). Mr. Romero began working at FTO in "May 2021," (Doc. # 142 at 185:1-7); (Doc. # 144 at 111:20-22), before this case was filed. (Doc. # 1). Critically, Mr. Romero testified as follows:

> Q. And your company [FTO] knew, since May of 2021, of your involvement in this whole -- in this whole situation; right?
>
> A.  Yes, that's right.
>
> Q. [FTO] had actual, direct knowledge of your involvement in the cover contracts; right?
>
> A. Yes.
>
> Q. Since May of 2021 up until now; right?
>
> A. Yes.
>
> . . .
>
> Q. In December of 2021, they knew of your involvement in this case; right?
>
> A. Yes.

(Doc. # 145 at 92:3-17).

Despite having this actual, direct knowledge, FTO never disclosed Mr. Romero during discovery as a witness. Towards the beginning of this case, on February 14, 2022, FTO issued its Initial Disclosures. (Doc. # 70-9). Yet, it did not disclose Mr. Romero as a witness with relevant knowledge. (Id. at 2-3). FTO never issued amended Initial Disclosures identifying Mr. Romero. Additionally, FTO did not disclose Mr. Romero in its responses to TGO's First Set of Interrogatories. (Doc. # 139-14).

Mr. Romero similarly was not disclosed or otherwise suggested to be the main damages witness during TGO's depositions of Mr. Janaudis in his personal capacity and as FTO's corporate representative.[3] Mr. Romero was only mentioned once in Mr. Janaudis' deposition as corporate representative. (Doc. # 69-6 at 10:15-11:20).

_____

[3] The Court may rely on Mr. Janaudis's depositions as evidence. The Court may take judicial notice of its own filings. Moore v. Birmingham Public Library, 559 Fed. App'x 847, 848 n.1 (11th Cir 2014). Additionally, the depositions were included as exhibits to FTO's motion for summary judgment. (Doc. ## 69-2, 69-6). Therefore, they are not subject to reasonable dispute.

However, in his deposition in his personal capacity, Mr. Janaudis discussed Mr. Romero's negotiation with TGO Singapore, an entity related to TGO, in which Mr. Romero apparently sought to adjust the terms of FTO's contract with TGO Singapore based on the alleged breach of contract at issue in this case. (Doc. # 69-2 at 263:23–264:7; 265:9-22; 267:15-25; 268:8-12; 269:13-21). Based on this information, TGO moved to compel depositions regarding the TGO Singapore contract. (Doc. 60 at ¶ 11). Given Mr. Romero's involvement in the TGO Singapore agreement, (Doc. # 69-2 at 263:23–264:7; 265:9-22; 267:15-25; 268:8-12; 269:13-21), he likely would have been deposed had this request been granted. FTO opposed TGO's motion to compel and the Court denied it. (Doc. # 73 at 1). However, FTO offered Mr. Romero's declaration, after discovery had closed. (Doc. # 64-1 at 2-3); (Doc. # 38 at 1).

## III. **Conclusions of Law**

The Court makes the following conclusions of law. To the extent that any conclusions of law might constitute findings of fact, they are adopted as such.

### A.   **CISG**

At summary judgment, the Court held that the United

Nations Convention on Contracts for the International Sale of Goods ("CISG") governs. (Doc. # 91 at 17). At trial, there was no dispute between the parties that the CISG governs the issue of contract formation in this case.

The CISG "applies to contracts of sale of goods between parties whose places of business are in different States . . . when the States are Contracting States." CISG, art. 1(a), opened for signature Apr. 11, 1980, S. Treaty Doc. No. 9, 98th Cong., 1st Sess. 22 (1983), 19 I.L.M. 671, reprinted at 15 U.S.C. app. 332 (1998). "The CISG automatically applies to international sales contracts between parties from different contracting states unless the parties agree to exclude its application. (Doc. # 91 at 16) (citing CISG, art. 6). It "governs only the formation of the contract of sale and the rights and obligations of the seller and the buyer arising from such a contract." CISG, art. 4.

"Under the CISG, the elements for breach of contract are formation of a contract, performance of a contract, breach of contract, and resulting damages." Supercase Enter. Co., Ltd. v. Marware, Inc., No. 14-61158-CIV-DIMITROULEAS, 2014 WL 12495261, at *4 (S.D. Fla. Nov. 24, 2014) (citing Dingxi

Longhai Dairy, Ltd. v. Becwood Tech. Grp. L.L.C., 635 F.3d 1106, 1108 (8th Cir. 2011)). A party bringing a claim under the CISG has the burden of proving all the above elements. Thomas v. George, Hartz, Lundeen, Fulmer, Johnstone, King, & Stevens, P.A., 525 F.3d 1107, 1110 (11th Cir. 2008) (stating that the "default rule" is that plaintiffs bear the burden of proof) (quoting Schaffer ex rel. Schaffer v. Weast, 546 U.S. 49, 56 (2005)).

To determine whether a binding agreement exists, the CISG first assesses an offer. An offer exists "if it is sufficiently definite and indicates the intention of the offeror to be bound in case of acceptance." CISG, art. 14(1). An offer is "sufficiently definite," in turn, if three elements exist: "it indicates the *goods* and expressly or implicitly fixes or makes provision for determining the *quantity* and *price*." Id. (emphasis added). The CISG only requires these three material terms to form an offer. Non-material terms, such as payment provisions or shipping provisions, are governed by the gap-filling provisions contained in CISG Articles 30 through 88 if such terms are not negotiated between the parties.

39

Next, the CISG requires acceptance of the offer. The standard is not onerous: "A statement made by or other conduct of the offeree indicating assent to an offer is an acceptance. Silence or inactivity does not in itself amount to acceptance." Id. at art. 18(1). "An acceptance of an offer becomes effective *at the moment the indication of assent reaches the offeror*." Id. (emphasis added). "A contract is concluded," in turn, "at the moment when an acceptance of an offer becomes effective in accordance with the provisions of this Convention." Id. at art. 23. An agreement "need not be concluded in or evidenced by writing and is *not subject to any other requirement as to form*." Id. at art. 11 (emphasis added).

Beyond the mode of communication to form a contract, when there is a dispute on a broader level as to whether the parties intended to enter into a binding agreement, "due consideration is to be given to all relevant circumstances of the case including the negotiations, any practices which the parties have established between themselves, usages and any subsequent conduct of the parties." Id. at art. 8(3). Article 9 of the CISG further explains the importance of the parties'

40

course of dealing, which the CISG applies in favor of contract formation:

> (1) The parties are bound by any usage to which they have agreed and by any practices which they have established between themselves.

> (2) The parties are considered, unless otherwise agreed, to have impliedly made applicable to their contract or its formation a usage of which the parties knew or ought to have known and which in international trade is widely known to, and regularly observed by, parties to contracts of the type involved in the particular trade concerned.

CISG, art. 9.

As noted above, the CISG does not require a signed, written contract to bind an agreement. Id. at art. 11. Oral statements and written communications of any form are sufficient to bind the parties so long as those communications otherwise satisfy the requirements of an offer and acceptance. See, e.g., AGB Contemp. A.G. v. Artemundi LLC, No. 20-1689, 2021 WL 1929356, at *5-6 (D. Del. May 13, 2021) (phone calls and emails "confirming" a "deal" would bind the parties under the CISG); Chateau des Charmes Wines Ltd. v. Sabate USA Inc., 328 F.3d 528, 531 (9th Cir. 2003) (oral agreement "sufficient to create complete and binding contracts" under the CISG where parties established an offer and acceptance as defined under

41

the CISG).

Rather than require rigid formalities to determine whether a binding contract exists, the CISG instead focuses on the parties' intent. See CISG, art. 18(1) (focusing on the offeree "indicating assent"). The parties' intent, in turn, is manifested by their statements and conduct. Id. Statements such as "[w]e now have a firm offer" and "I confirm our deal" confirm the parties' intent to be bound. AGB Contemp. A.G., 2021 WL 1929356, at *5-6.

This approach is further supported by the United Nations Convention on the Use of Electronic Communications in International Contracts, 2005 ("ECC"), which the CISG describes as complementing the terms of the CISG and "promot[ing] the understanding that the 'communication' and/or 'writing' under the CISG should be construed so as to include electronic communications." CISG, comments ¶ 39.

The ECC mirrors the CISG in explaining that contracts are not required "to be made or evidenced in any particular form." ECC, art. 9(1). But "[w]here the law requires that a communication or a contract should be in writing, or provides consequences for the absence of a writing, that requirement is

met by an electronic communication if the information contained therein is accessible so as to be usable for subsequent reference." Id. at art. 9(2). As applied here, even if the parties were required to have some form of writing to bind TGO's contractual obligations, the WhatsApp messages were sufficient.

### B. Sufficiently Definite Offer

As noted above, the CISG defines a "sufficiently definite offer" as one that specifies the goods, quantity, and price. CISG, art. 14(1). The offer does not require any formal writing; oral statements, emails, and any other form of written communication are acceptable so long as the content of that communication identifies the goods, quantity, and price. Id. at art. 11; AGB Contemp. A.G., 2021 WL 1929356, at *5 (determining that "[w]e now have a firm offer" was sufficient evidence of offeror's intent to be bound where price, quantity, and good were identified).

At trial, the parties agreed that FTO's offer expressly fixed the quantity and price of the relevant transaction at 45,000 metric tons at $145 per metric ton. (Doc. # 143 at 109:3-7, 131:23-132:1, 132:15-18, 133:5-14, 140:13-17,

43

150:21-24, 158:7-9). However, TGO argued that the "good" subject to FTO's offer was not sufficiently definite because FTO purportedly demanded ammonium sulfate containing 21% nitrogen content while TGO could only deliver 20.5% nitrogen content. (Doc. # 154 at 13-16). The Court is not persuaded.

First, authority interpreting the CISG makes clear that the identification of the "good" as required by CISG Article 14(1) is broad and does not require that the offeror identify all product specifications. For example, the court in Geneva Pharmacies Tech. Corp. v. Barr Lab'ys, Inc., No. 98 CIV.961 RWS, 99 CIV.3687 RWS, 2002 WL 1933881 (S.D.N.Y. Aug. 21, 2002), held that the identification of the chemical "clathrate", without further specification of that compound, was a sufficiently definite identification of the "good." Id. at *3. The court did not require the parties to identify the molecules at issue or anything more specific about the subject compound. Id.; see also Solae, LLC v. Hershey Canada, Inc., 557 F. Supp. 2d 452, 454, 457 (D. Del. 2008) (determining that a contract existed where the good was identified as the food additive soy lecithin). Therefore, in this case, the identification of "ammonium sulfate" or "amsul" was

sufficient under the CISG.

Second, the parties' prior practices and mutual understanding of permissible nitrogen levels under Brazilian regulations for granular ammonium sulfate indicate that both parties intended the "good" to be granular ammonium sulfate with nitrogen content between 20.5%-21%. (Doc. # 142 at 83:1-3); (Doc. # 143 at 19:13-22, 139:5-9, 139:21-24); (Doc. # 144 at 14:2-4, 14:14-17); (Doc. # 145 at 249:17-250:24, 255:23-256:11); (Doc. # 140-11); see (Doc. # 139-10) (contracting for the purchase of ammonium sulfate with a nitrogen content of 20.5%). Indeed, in the October 2020 transaction between the parties for the same product, the formal contract rounded down to specify 20.5% nitrogen in the purchase confirmation, while the bills of lading and invoices for this transaction rounded up to specify 21% nitrogen ammonium sulfate, and the delivered product had an actual nitrogen level of 20.8%. (Doc. # 143 at 113;16-20, 128:13-24); (Doc. # 144 at 85:15-19); (Doc. # 145 at 259:10-17). Compare (Doc. # 140-2) (specifying ammonium sulfate with 21% nitrogen) and (Doc. # 139-8) (same), with (Doc. # 139-10) (contracting for ammonium sulfate that was 20.5% nitrogen)

45

and (Doc. # 143 at 113:16-20) (noting that the October 2020 ammonium sulfate contained 20.8% nitrogen). Simply put, the variations are not material.

Indeed, both Mr. Janaudis and Mr. Santos confirmed that the difference between 20.5% and 21% nitrogen levels is immaterial, as both levels would satisfy the Brazilian authorities. (Doc. # 142 at 82:14-83:3, 97:16-98:1, 99:9-12, 194:22-195:2); (Doc. # 143 at 14:2-5, 22:5-23); (Doc. # 144 at 88:11-14). Mr. Bodanese also explained to Mr. Cui that written contracts for the purchase of ammonium sulfate with Brazilian counterparties typically reflect 20.5% nitrogen, with the inspector's certificate reflecting a value of 21% nitrogen. (Doc. # 145 at 249:17-250:24, 255:23-256:11); (Doc. # 140-11). Mr. Cui himself understood that FTO would accept ammonium sulfate with 20.5% nitrogen due to prior contracts. E.g., (Doc. # 139-10) (contracting for the purchase of ammonium sulfate with 20.5% nitrogen content).

C. **Acceptance of FTO's Offer**

As with the offer, the CISG considers the language and conduct of the offeree to determine acceptance. CISG, art. 18(1). No specific terms or provisions are required. See AGB

Contemp. A.G., 2021 WL 1929356, at *5-6 (determining that an email stating "I confirm our deal" was sufficient to constitute binding acceptance of offer); Roser Techs., Inc. v. Carl Schreiber GmbH, No. 11cv302 ERIE, 2013 WL 4852314, at *11 (W.D. Pa. Sept. 10, 2013) (determining that statement to proceed with performance constituted acceptance).

Here, throughout the course of this action, TGO contested that it accepted FTO's offer to purchase 45,000 metric tons of ammonium sulfate at $145 per metric ton. E.g., (Doc. # 91 at 21). At trial, however, Mr. Cui testified that TGO "closed" a sale with FTO to deliver 45,000 metric tons of ammonium sulfate at a price of $145 per metric ton. (Doc. # 143 at 109:3-7, 131:23-132:1, 132:15-18, 133:5-14, 140:13-17, 150:21-24, 158:7-9).

First, Mr. Cui affirmed that Mr. Bodanese, on behalf of TGO, closed a deal on September 11, 2020, for 20,000 metric tons of ammonium sulfate at $145 per metric ton:

> Q. Sir, was Mauricio Bodanese correct in his text message to you of September 11, 2020, that the deal for 20,000 metric tons at $145[.00], including cost and freight, quote/unquote, closed? Is that a correct statement to you, sir?
>
> A. It is.

(Doc. # 143 at 109:3-7).

Second, Mr. Cui affirmed that Mr. Bodanese closed a modification to increase the ammonium sulfate purchase by 10,000 metric tons for a total of 30,000 metric tons at $145 per metric ton:

> Q. In the exhibit that we're seeing, . . . Mr. Bodanese is communicating to you that the total aggregate deal for 30,000 metric tons of ammonium sulphate is now 30,000 metric tons closed; right?
>
> A. Right.

(Id. at 118:13-17).

Third, Mr. Cui confirmed that TGO agreed to a further increase in FTO's purchase by another 15,000 metric tons, for a total of 45,000 metric tons of ammonium sulfate at $145 per metric ton:

> Q. Well, sir, we know from later communications in your text messages that you were referring to the approval of the $145 per metric ton -- hold on. You were approving Mauricio's proposal to present that to Eric. And when Mauricio says 'done,' he means that last part of the deal closed; isn't that right?
>
> A. Yes. I --
>
> Q. Did you say yes?
>
> A. You want me to say, yes, we agreed 45,000 tons at 145; right? Yes, we agreed. 45,000 tons at 145

48

based on 20.5 percent nitrogen. But we have been expecting FTO to come back, reconfirm whether we reached agreement on the specifications, on producers. If they reconfirm, then the order is 45,000 tons. But they don't come back to confirm. That is why Mauricio never sent any confirmation, sales confirmation, and we never sent any contract to you. Okay.

(Id. at 157:24 – 158:15). The Court found Mr. Cui's later admission that TGO had agreed to sell 45,000 metric tons to FTO more credible than his earlier testimony to the contrary.

Additionally, these statements comport with the documentary evidence. Mr. Bodanese, acting on behalf of TGO, reported in writing to Mr. Cui that he "closed" FTO's initial purchase of 20,000 metric tons of ammonium sulfate on September 11, 2020. (Doc. # 140-13 at FTOvTGO_004219, FTOvTGO_004221). He likewise reported to Mr. Cui that he "closed" the first modification to increase FTO's purchase to a total of 30,000 metric tons, also on September 11, 2020. (Id. at FTOvTGO_004242).

The evidence also establishes that FTO made an offer to further modify the parties' agreement on September 23, 2020, to increase its purchase by another 15,000 metric tons, for a total purchase of 45,000 metric tons of ammonium sulfate.

(Doc. # 142 at 27:24-28:4, 125:3-5, 125:11-18, 126:2-11);
(Doc. # 143 at 118:19-23, 159:6-19); (Doc. # 144 at 66:21-
24); (Doc. # 140-13 at FTOvTGO_004248). In response to
the request for modification, however, TGO initially rejected
FTO's price of $145 per metric ton, making a counteroffer at
$147.50 per metric ton for the additional 15,000 metric tons.
(Doc. # 143 at 146:20-23); (Doc. # 140-14 at FTOvTGO_004310).
At Mr. Bodanese's suggestion, however, Mr. Cui ultimately
agreed to honor the $145 per metric ton price for the entire
45,000 metric ton purchase, telling Mr. Bodanese, "Ok, go
ahead." (Doc. # 142 at 126:2-17); (Doc. # 140-14 at
FTOvTGO_004311-13, FTOvTGO_004315). While Mr. Cui argued that
this statement was in relation to another potential deal (Doc.
# 143 at 155:23-158:15), Mr. Bodanese relayed TGO's acceptance
to FTO and Mr. Cui did not later contradict him. (Doc. # 142
at 126:2-17). Therefore, the Court believes that this
statement was made in relation to the FTO contract.

In fact, Mr. Cui's statements in the months after
September 2020 confirm TGO's obligation to deliver 45,000
metric tons of ammonium sulfate. On October 16, 2020, Mr. Cui
asked Mr. Bodanese for a "recap" of 2021 sales. (Doc. # 140-

14 at FTOvTGO_004335). Mr. Bodanese included the FTO deal in this recap. (Id. at FTOvTGO_004336). On November 18, 2020, Mr. Cui requested another recap of 2021 sales. (Id. at FTOvTGO_004360). When Mr. Bodanese included the FTO deal in the recap, Mr. Cui did not contradict or question him. (Id. at FTOvTGO_004363, FTOvTGO_004366-68).

True, TGO highlights Article 19 of the CISG, which states that "[a]dditional or different terms relating, among other things, to the price, payment, quality and quantity of the goods, place and time of delivery, extent of one party's liability to the other or the settlement of disputes are considered to alter the terms of the offer materially." CISG, art. 19. But this provision does not negate the existence of a contract here. The parties initially formed an agreement consisting of three terms: product, price, and quantity. Disagreements about any additional terms arose after this contract was formed.

TGO advanced two additional arguments for why this agreement should not be considered a binding contract: (i) additional terms were necessary to form a binding agreement; and (ii) a formal, signed writing is required for the

agreement to be binding. (Doc. # 154 at 4-10, 13-21). Both arguments fail.

First, the CISG specifies only three terms necessary to form a contract: price, product, and quantity. CISG, art. 14(1). If non-material terms, such as shipping location and payment terms, are not negotiated among the parties, the CISG applies a standard term to fill the gap. See Id. at art. 30-88 (outlining standard terms).

TGO also failed to demonstrate that the parties' custom required additional material terms before a transaction is binding. As a preliminary matter, Mr. Cui agreed that product, quantity, and price are necessary terms for a binding offer. (Doc. # 145 at 136:6-8). Mr. Liu, a TGO employee who was responsible for drafting formal contracts, also noted that the inclusion of additional terms beyond what the parties had negotiated requires "back and forth" negotiation and is subject to additional approval. (Id. at 239:6-12). Additionally, in two prior contracts, TGO shipped the ammonium sulfate before finalizing the formal contract with a full range of terms. (Doc. # 139-2); (Doc. # 142 at 76:4-13; 78:15-79:8); (Doc. # 139-4). Importantly, TGO was aware that FTO generally

sold the ammonium sulfate that it purchased at the time of confirmation over WhatsApp. (Doc. # 140-14 at FTOvTGO_004311).

Therefore, TGO did not indicate that other terms were necessary to form a binding transaction. Instead, its actions confirmed a binding agreement had formed once product, quantity, and price were established.

The Court also found the testimony of Mr. Reiners, FTO's expert, persuasive on this point. He stated that quantity, price, and product are the only material terms to be included in a binding contract. (Doc. # 143 at 234:12-22). Other terms are implicitly agreed upon based on prior interactions. (Id. at 233:23-234:7). While Mr. Beardmore, TGO's expert, provided contrary testimony, he has never negotiated any deals in the Brazilian market. (Doc. # 145 at 193:23-194:2). Further, Mr. Beardmore conceded that additional terms are not necessary to form a binding contract, stating:

> Q. I have not heard you say until today that in addition to quantity, products, price, we need plural terms. What is this new category of terms? Specify –
>
> A. Everything that goes into a contract. The things that make the contract long.

Q. How many terms would these be?

A. Force majeure, terms limited liability, who pays the insurance, who pays the freight. All those things get built into the agreement.

Q. But you don't have to have those things on a binding deal; right?

A. If you don't have those things, you take great risk.

Q. The question still stands, though, you do not have to have these extra terms to have a binding deal. Would you agree?

A. I guess that's correct.

(Id. at 205:9-23).

Second, the evidence at trial likewise established that the parties did not require any formal agreement to form a contract. The fertilizer commodities trade is fast paced and transactions must close quickly to respond to market conditions. (Doc. # 142 at 39:10-22, 51:9-13, 62:17-23, 185:24-186:8); (Doc. # 144 at 69:6-11, 92:8-10); (Doc. # 145 at 171:9-18). Indeed, in two of the parties' prior transactions, TGO shipped product before any formal, executed agreement was in place. (Doc. # 139-2); (Doc. # 142 at 76:4-13, 78:15-79:8); (Doc. # 139-4). Nor does the CISG require

any formal writings as evidence of the existence of a binding agreement. <u>See</u> CISG, art. 11 (stating that an agreement "need not be concluded in or evidenced by writing and it *not subject to any other requirement as to form*" (emphasis added)).

As a final note, this Court notes that the individuals who negotiated the agreement for FTO and TGO each had authority to enter into a binding contract. (Doc. # 142 at 62:21-63:7); (Doc. # 143 at 85:22-24); (Doc. # 144 at 11:20-12:1, 16:18-17:4, 18:11-22); (Doc. # 139-16 at ¶ 3.2).

### D.   <u>Breach of Contract</u>

There was no dispute at trial that TGO never delivered the 45,000 tons of ammonium sulfate that FTO contracted to purchase. (Doc. # 92 at ¶ 9.k). Therefore, FTO has established this element of its claim.

### E.   <u>Damages</u>

#### 1.   **Disclosure of Juan Romero as a Witness**

As a preliminary matter, this Court will not consider Mr. Romero's testimony, given FTO's failure to disclose him as a witness during discovery.

The Eleventh Circuit has held that "when a party fails to comply with Rule 26," by failing to include witnesses in

initial disclosures, testimony from those undisclosed witnesses may be excluded. See Lawver v. Hillcrest Hospice, Inc., 300 Fed. App'x 768, 770 (11th Cir. 2008) ("[W]hen a party fails to comply with Rule 26, the district court does not abuse its discretion by striking an affidavit submitted in opposition to summary judgment."). Further, the fact that a defendant "had notice" of a witness is an insufficient disclosure by the plaintiff, because a defendant is "entitled to rely on the fact that [the plaintiff] did not disclose [the witness] as either a fact or expert witness and therefore would not be relying on his testimony at trial." Civix-DDI, LLC v. Cellco P'ship, 387 F. Supp. 2d 869, 898 n.34 (N.D. Ill. 2005).

In this case, despite having actual, direct knowledge of Mr. Romero's involvement in the alleged cover purchases, (Doc. # 144 at 116:5-11), FTO did not disclose Mr. Romero in its Initial Disclosures. (Doc. # 70-9, at 2-3). FTO also did not disclose Mr. Romero in response to TGO's Interrogatories. (Doc. # 139-14). Importantly, Mr. Romero also did not sign any of the four cover contracts into which FTO entered. (Doc. # 139-17); (Doc. # 140-5); (Doc. # 140-6); (Doc. # 140-7).

Instead, as TGO highlights, Mr. Romero's name appears in only eight documents, out of over 2,500 pages of documents that FTO produced during discovery. (Doc. # 155-1). Because of this lack of disclosure, the Court will not consider Mr. Romero's testimony.

The fact that Mr. Romero's name was mentioned in depositions and in a few documents does not mean that he was sufficiently disclosed "in the discovery process." Fed. R. Civ. P. 26(e)(1)(A). Courts in this District have held that only a robust written disclosure of a witness during discovery excuses a party from having to issue amended disclosures to include previously undisclosed witnesses. Specifically,

> this District ha[s] previously found that mere identification of a witness during discovery does not necessarily relieve a party's obligation to supplement its Rule 26 disclosures.
>
> . . .
>
> [T]he purpose of Rule 26(a) is not furthered by [r]equiring [a party] to ferret out the names and addresses of potential witnesses listed in hundreds of pages of documents . . . .

Jordan v. IAP Worldwide Servs., Inc., No. 6:18-cv-1610-RBD-EJK, 2019 WL 13152019, at *3 (M.D. Fla. Oct. 23, 2019)

(citation and internal quotation marks omitted).

Courts have also rejected "a party's attempts to shift the burden of disclosure" to the opposing party. Superior Consulting Servs., Inc. v. Shaklee Corp., No. 6:16-cv-2001-GAP-GJK, 2018 WL 1474184, at *3 (M.D. Fla. Mar. 7, 2018), report and recommendation adopted, No. 6:16-cv-2001-GAP-GJK, 2018 WL 1470371 (M.D. Fla. Mar. 26, 2018). Further, "a passing reference in a deposition to a person with knowledge or responsibilities who could conceivably be a witness does not satisfy a party's disclosure obligations." Jordan, 2019 WL 13152019, at *3 (quoting Ollier v. Sweetwater Union High Sch., 768 F.3d 843, 863 (9th Cir. 2014)).

Critically, this Court has held that an "adverse party should not have to guess which undisclosed witnesses may be called to testify." Jordan, 2019 WL 13152019, at *3 (citations omitted). A party does not satisfy the "made known" exception of Rule 26(e) "unless it ha[s] been made clear during the deposition testimony not just that the person existed and had information but also that the party intended to use that person to support its claims." Superior Consulting Servs., Inc., 2018 WL 1474184, at *2. The

58

references to Mr. Romero during Mr. Janaudis's depositions do not meet this standard. (Doc. ## 69-2, 69-6).

For all these reasons, the Court will not rely on Mr. Romero's testimony in deciding this case.

### 2.   Cover Contracts

Pursuant to Article 45 of the CISG, "[i]f the seller fails to perform [its contractual] obligations . . . , the buyer may . . . exercise its rights as provided in articles 46 to 52 [or] claim damages as provided in articles 74 to 77." CISG, art. 45. Here, FTO seeks damages pursuant to Article 75, which provides:

> If the contract is avoided and if, in a reasonable manner and within a reasonable time after avoidance, the buyer has bought goods in replacement or the seller has resold the goods, the party claiming damages may recover the difference between the contract price and the price in the substitute transaction as well as any further damages recoverable under article 74.

CISG, art. 75.

Article 74 allows for the non-breaching party to recover consequential damages. CISG, art. 74. Additionally, actual damages must be proven; they cannot be merely speculative or conjectural. Nat Harrison Assocs., Inc. v. Gulf States Utils. Co., 491 F.2d 578, 587 (5th Cir. 1974).

59

FTO entered into four separate cover transactions for the 45,000 metric tons of ammonium sulfate. (Doc. # 140-5); (Doc. # 140-6); (Doc. # 140-7); (Doc. # 139-17). Mr. Reiners, FTO's expert, provided credible evidence that the prices in these contracts were reasonable based on the Bloomberg North American index. See (Doc. # 143 at 240:4-8, 241:5-14, 260:1-18) (providing testimony about the reasonableness of the contract prices). While the Court acknowledges that the North American index may not be the ideal index for these calculations, the values it reflected likely factored into FTO's decisions to form the cover contracts. Additionally, testimony from trial highlighted the difficulty of obtaining quality ammonium sulfate and the increase in the price of ammonium sulfate during the time when FTO sought cover contracts. (Doc. # 142 at 147:13-19); (Doc. # 143 at 165:7-170:5). Therefore, the Court will award damages based on the four cover contracts.

TGO argues that FTO should not be permitted to recover damages under the two Saftco contracts because they are "egregiously incomplete." (Doc. # 154 at 28). Specifically, TGO objects to the contracts because they do not contain an

60

attachment "Exhibit A." (Id. at 29). However, the Court determines that FTO may still recover damages based on these contracts, despite the omission of Exhibit A.

TGO first argues that the Court should not consider these contracts because they violate the Federal Rule of Evidence 106. (Id. at 28-29). Rule 106 states:

> If a party introduces all or part of a statement, an adverse party may require the introduction, at that time, of any other part—or any other statement—that in fairness ought to be considered at the same time.

Fed. R. Evid. 106.

"Under the doctrine of completeness codified in Federal Rule of Evidence 106, a party wishing to introduce only a portion of a recorded statement [or document] may be precluded from doing so where partial disclosure out of context would result in unfairness to the other party." United States v. Millan, 230 F.3d 431, 434 (1st Cir. 2000). However, given that the portions of the Saftco contracts included the material terms (the product, quantity, and price), (Doc. ## 140-5, 140-6), TGO is not disadvantaged by the exclusion of Exhibit A from these contracts.

TGO also challenges the admissibility of these contracts

61

under Rule 403. (Doc. # 154 at 29). However, this argument fails for the same reason: as Exhibit A to each of the Saftco contracts only included non-material terms, TGO is not prejudiced by the exclusion of these exhibits.

Finally, TGO challenges the admissibility of these documents based on the best evidence rule, Federal Rule of Evidence 1002. (Id. at 29-30). This rule states that "[a]n original writing, recording, or photograph is required in order to prove its content unless these rules or a federal statute provides otherwise." Fed. R. Evid. 1002. "[T]he Best Evidence Rule only applies when the contents of the writing or recording are sought to be proved." United States v. Holland, 223 Fed. App'x 891, 898 (11th Cir. 2007). Among other things, the "rule guards against . . . incompleteness." United States v. Davis, 596 F.3d 852, 858 n.4 (D.C. Cir. 2010). "A duplicate is admissible to the same extent as the original unless a genuine question is raised about the original's authenticity or the circumstances make it unfair to admit the duplicate." Fed. R. Evid. 1003.

The best evidence rule requires a complete original with all its pages "when only a part of the original is reproduced,

and the remainder is needed for cross-examination or may disclose matters qualifying the part offered or otherwise useful to the opposing party." Id. at advisory committee's note to 1972 amendment. A non-original copy violates the best evidence rule when a "critical part of the original . . . [is] not completely reproduced in the 'duplicate.'" Amoco Prod. Co. v. United States, 619 F.2d 1383, 1391 (10th Cir. 1980).

This argument fails as well. As above, the main body of each Saftco contract includes the three material terms. Therefore, all critical parts of the contracts were provided to the Court. Further, an exception to the best evidence rule applies here: "the writing . . . is not closely related to a controlling issue." Fed. R. Evid. 1004. While TGO argues that these contracts are closely related to the key issue of damages and to determining industry standards, (Doc. # 154 at 30), the price of the ammonium sulfate is included in the main body of each contract. (Doc. ## 140-5, 140-6). Additionally, the inclusion of additional terms in a non-negotiated exhibit suggests that the terms in Exhibit A were not material within the industry.

63

Therefore, FTO may recover damages based on these contracts.

### 3.    Additional Related Costs

However, FTO failed to provide sufficient evidence to support the additional related costs, including the increased transportation costs from Santos port, take-or-pay costs, or demurrage costs. FTO did not introduce any documents at trial to prove these costs. Additionally, the Court has determined that it is inappropriate to rely on Mr. Romero's testimony to establish the value of these costs, given the lack of disclosure that he would be a key witness. Therefore, FTO may not recover these costs.

In sum, FTO originally intended to pay $6,525,000 for ammonium sulfate purchased from TGO, or 45,000 metric tons at $145 per metric ton. Instead, FTO paid $13,328,000 for ammonium sulfate under the four cover contracts: (1) $687,000 for 3,000 metric tons at $229 per metric ton from Saftco, (2) $2,040,000 for 8,000 metric tons at $255 per metric ton from Ameropa, (3) $3,080,000 for 11,000 metric tons at $280 per metric ton from Saftco, and (4) $7,521,000 for 23,000 metric tons at $327 per metric ton from Yingu Yunnan. The difference

between these values is $6,803,000.

Therefore, FTO is entitled to recover $6,803,000 in damages.

### F.   <u>Interest</u>

FTO is entitled to prejudgment interest at the Florida statutory rate under Article 78 of the CISG and post-judgment interest under 28 U.S.C. § 1961 from the date of the judgment until paid. <u>See</u> CISG, art. 78 ("If a party fails to pay the price of any other sum that is in arrears, the other party is entitled to interest on it . . . ."); 28 U.S.C. § 1961 (permitting post-judgment interest).

### 1.   **Prejudgment Interest**

Article 78 of the CISG "expressly provides for recovery of pre-judgment interest." <u>Zhejiang Shaoxing Yongli Printing and Dyeing Co., Ltd. v. Microflock Textile Grp. Corp.</u>, No. 06-22608-CIV-O'SULLIVAN, 2008 WL 11333554, at *1 (S.D. Fla. July 23, 2008); CISG, art. 78.

Because the CISG itself does not provide a method for determining the rate of interest, the rate is determined according to Florida law. <u>Zhejiang</u>, 2008 WL 11333554, at *1; <u>PK Motors, Inc. v. Page</u>, No. 3:06-cv-693-MMH-TEM, 2003 WL

25570794, at *2 (M.D. Fla. 2003). Under Florida law, "a plaintiff is entitled to prejudgment interest as a matter of law." SEB S.A. v. Sunbeam Corp., 476 F.3d 1317, 1320 (11th Cir. 2007) (citing Argonaut Ins. Co. v. May Plumbing Co., 474 So. 2d 212, 215 (Fla. 1985)). "The computation of prejudgment interest is 'a mathematical computation' and 'a purely ministerial duty.'" Id. "Absent a written agreement concerning the applicable interest rate, a statutory rate applies instead." Thistle Commc'ns, LLC v. E-1 Machine, LLC, No. 2:18-cv-679-KCD, 2020 WL 13389812, at *8 (M.D. Fla. June 24, 2020) (citing Fla. Stat. § 687.01).

"Prejudgment interest accrues from the date of the loss, or accrual of the action, and is an element of damages until final judgment is rendered." Sunbelt Rentals, Inc. v. Masonry & Constr. Servs., Inc., No. 8:20-cv-1539-TPB-AAS, 2020 WL 8461567, at *2 (M.D. Fla. Dec. 17, 2020), report and recommendation adopted, No. 8:20-cv-1539-TPB-AAS, 2021 WL 222778 (M.D. Fla. Jan. 22, 2021). "In a breach of contract case, '[g]enerally, interest awarded as damages in a contract action runs from the date when the right to recover on the claim became vested or accrued, which is ordinarily the date

66

of the breach or the date when payment was due under the contract." Merlin Petroleum Co., Inc. v. Sarabia, No. 8:16-cv-1000-CPT, 2017 WL 11629159, at *1 (M.D. Fla. June 8, 2017) (quoting Craigside, LLC v. GDC View, LLC, 74 So. 3d 1087, 1092 (Fla. 1st DCA 2011)).

In this case, the date of FTO's loss and the accrual of this action against TGO is May 14, 2021. This is the date when Mr. Cui emailed FTO that TGO would not perform under the agreement, as TGO averred that a contract did not exist. See (Doc. # 139-18 at FTO 002861-65) (communicating to FTO that TGO did not believe they had a contract).

As the parties did not agree to a prejudgment interest rate in the contract, the rate is set by Florida's statutory rate. "The interest rate is established at the time a judgment is obtained and such interest rate [is] adjusted annually on January 1 of each year in accordance with the interest rate in effect on that date as set by the Chief Financial Officer until the judgment is paid . . . ." Fla. Stat. § 55.03(3). The annual rate in effect on May 14, 2021, was 4.31% or a daily rate of .0118082%. Fla. Dep't of Fin. Servs., Current Judgment Interest Rates, MyFloridaCFO,        https://myfloridacfo.com/division/aa/local-

67

governments/judgement-interest-rates (last visited Feb. 23, 2024). The annual rate in effect on January 1, 2022, was 4.25% or a daily rate of .0116438%. Id. The annual rate in effect on January 1, 2023, was 5.52% or a daily rate of .0151233%. Id. The annual rate in effect on January 1, 2024, was 9.09% or a daily rate of .0248361%. Id.

Applying these rates, FTO is entitled to $959,155.27 in prejudgment interest.

### 2.   Postjudgment Interest

"While state law governs prejudgment interest in diversity cases, federal law governs postjudgment interest." Apple Glen Invs., L.P. v. Express Scripts, Inc., No. 8:14-cv-1527-VMC-TGW, 2016 WL 4702428, at *5 (M.D. Fla. Sept. 8, 2016) (citing G.M. Brod & Co., Inc. v. U.S. Home Corp., 759 F.2d 1526, 1542 (11th Cir. 1985)). "Such interest shall be calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding." 28 U.S.C. § 1961.

Based on this provision, FTO is also entitled to post-judgment interest.

Accordingly, it is hereby

**ORDERED, ADJUDGED,** and **DECREED:**

(1) The Clerk is directed to enter judgment in favor of Plaintiff Fertilizantes Tocantins S.A. and against Defendant TGO Agriculture (USA) Inc. in a sum of $6,803,000 for the breach of contract, $959,155.27 in prejudgment interest, and for post-judgment interest under 28 U.S.C. § 1961.

(2) Fertilizantes Tocantins S.A. has fourteen days from the date of this Order to file any motions for attorney's fees and costs.

(3) The Clerk is directed to **CLOSE** this case.

**DONE** and **ORDERED** in Chambers in Tampa, Florida, this <u>4th</u> day of March, 2024.

VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE